TURTLE ISLAND RESTORATION
NETWORK; Center for Biological
Diversity, Plaintiffs–Appellants,

v.

NATIONAL MARINE FISHERIES
SERVICE, Defendant–
Appellee.

No. 02–15027.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 2003.

Filed Aug. 21, 2003.

Deborah A. Sivas, Earthjustice Legal Defense Fund, Stanford, CA, and Brendan B. Cummings, Idyllwild, CA, for the appellants.

James C. Kilbourne, Attorney, United States Department of Justice, Washington, DC, for the appellee.

Before HUG, ALARCÓN and GRABER, Circuit Judges.

## OPINION

HUG, Circuit Judge.

The Center for Biological Diversity and the Turtle Island Restoration Network (collectively, the "Center") appeal the district court's grant of summary judgment in favor of the National Marine Fisheries Service ("Fisheries Service"). This case presents the question of whether the issuance of fishing permits by the Fisheries Service pursuant to the High Seas Fishing Compliance Act ("Compliance Act"), 16 U.S.C. § 5501–5509, invokes the consultation requirements of the Endangered Species Act ("ESA"). The Center brought this action pursuant to the citizen suit provision of the ESA alleging that the Fisheries Service was violating the consultation and take provisions of the ESA through the issuance of fishing permits to longline fishing vessels in California. The Center asserts that longline fishing results in harm to several endangered and protected species including several varieties of sea turtles and sea birds that become entangled in the longlines. The district court found that the issuance of permits under the Compliance Act does not invoke the consultation requirements of the ESA because the Fisheries Service did not have sufficient discretion to condition permits

for the benefit of a protected species. However, we conclude that the plain language of the Compliance Act does contain ample discretion to allow the conditioning of permits for the benefit of protected species, and we reverse the judgment of the district court.

## I

## Procedural and Factual Background

This case concerns United States-flagged vessels that engage in longline fishing practices on the high seas of the Pacific Ocean and land their catch in California. Longline fishing involves the use of a line that stretches several miles from a vessel and is anchored to appropriate depths. Attached to the longline are many additional lines to which weights and baited hooks are fastened. A single longline may deploy several thousand hooks at one time. Longline fishing vessels mainly target swordfish but also fish for other migratory species, such as varieties of tuna and shark.

Until recently, most U.S. vessels that engaged in longline fishing were based in Hawaii. In November 1999, a district court in Hawaii issued a preliminary injunction restricting longline fishing under the Hawaii Fishery Management Plan throughout much of the North Pacific. *Center for Marine Conservation v. National Marine Fisheries Service,* (Civ. No. 99–00152(DAE)(D.Hawaii)).[1] Pursuant to the requirements of the ESA, the Fisheries Service issued a biological opinion concluding that the operation of the Hawaii Fishery Management Plan would jeopardize the continued existence of the several protected species of sea turtles. Subsequent revisions to the Hawaii Fisheries Management Plan eliminated the Hawaii-based longline swordfish fishing industry. Consequently, numerous boats from Hawaii relocated to California ports.[2]

On July 6, 2000, the Center sent a letter to the Secretary of Commerce, giving a 60–day notice of intent to sue for violations by the Fisheries Service of Sections 7 and 9 of the Endangered Species Act.[3] The Center first contended that the Fisheries Service is violating Section 7 of the ESA by failing to initiate and complete consultations concerning the effects on threatened and endangered species of longline fishing by U.S. vessels, under permits issued by the Fisheries Service. The protected species designated included the leatherback,[4] loggerhead,[5] olive ridley,[6] and green,[7] sea

1. Hawaiian longline fishing is managed under the federal Fishery Management Plan for Pelagic Fisheries in the Western Pacific Region. Vessels that are under the Hawaii Fishery Management Plan fish both within the U.S. 200–mile exclusive economic zone, as well as in the high seas. As long as the vessels are unloading their catch in Hawaii, these vessels are subject to the rules and regulations of Hawaii's Fishery Management Plan.

2. The record shows that since December 1999, at least 40 longline boats originating in Hawaii have unloaded their catch in California ports. The quantity of swordfish landed at San Pedro, California increased from 1.5 million pounds in 1999 to 2.6 million pounds in 2000.

3. The 60–day notice of intent to sue was sent to comply with the citizen suit provision of 16 U.S.C. § 1540(g)(2).

4. The leatherback sea turtle (*Dermochelys coriacea*) is listed as endangered by the ESA throughout its global range. 50 C.F.R. § 17.11. The leatherback is the largest sea turtle weighing between 700 and 2000 pounds as an adult, and ranging from four to eight feet in length. Unlike many other sea turtles, the leatherback has a soft rubbery shell. The species feeds primarily on jellyfish and is capable of diving to depths greater than 3,000 feet.

5. The loggerhead sea turtle (*Caretta caretta*) is listed as a threatened species under the ESA. 50 C.F.R. § 17.11. The loggerhead is characterized by a reddish brown, bony cara-

turtles, as well as the short-tailed albatross.[8] Second, the Center contended that the Fisheries Service failed to comply with Section 9 of the ESA by granting permits to private parties that result in the "take" of threatened or endangered species. It contended that a governmental body under whose authority an actor exacts a taking of an endangered or threatened species can also be held responsible for the taking under Section 9.

On September 1, 2000, the Fisheries Service's Regional Administrator sent a letter in response, stating that under the Fisheries Service's interpretation of the Compliance Act, the agency lacked discretion in issuing the fishing permits to impose conditions that further the conservation of protected species; therefore, the consultation provisions of the ESA were not implicated. Further, the agency was developing a fishery management plan for high seas migratory species and that an ESA consultation would be conducted during that administrative process to consider the impact of California's longline fleet on threatened and endangered species. The

Fisheries Service stated that it would investigate any take of protected species by fisherman engaged in the high seas fishery. The Center then filed suit against the Fisheries Service asserting the three claims outlined in its notice letter.

The district court resolved the case on cross-motions for summary judgment. The court rejected the Center's claims that the Fisheries Service was in violation of ESA Section 7 by not consulting prior to the issuance of the permits. It held that the agency lacked discretion in issuing the permits to impose conditions furthering the conservation of protected species and that nothing in the Compliance Act "provides the Secretary with the authority to place such conditions on permits." *Center for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 2001 WL 1602707, at *3, 2001 U.S. Dist. LEXIS 20862, *10 (N.D.Cal.2001). The court concluded that because the agency had no discretion to condition permits for the benefit of listed species, it could not be held liable under ESA Section 9 for any take of such species by individual fishing vessels. *Id.*

---

pace, with a comparatively large head, up to 25 centimeters wide. Adult loggerheads range in weight between 150 and 400 pounds and are typically 2.5 to 3.5 feet long. The loggerhead feeds primarily on mollusks and crustaceans. All loggerhead turtles in the Pacific breed in the western Pacific.

6.  The olive ridley sea turtle (*Lepidochelys olivacea*) is listed as threatened by the ESA throughout its global range, however the Mexican nesting population is listed as endangered. 50 C.F.R. § 17.11. The olive ridley is one of the smallest sea turtles and nests in the Indian Ocean along the coast of India and in the eastern Pacific along the coasts of Mexico and Central America. It generally feeds on mollusks and crustaceans. The primary threats to the species are mortality from fishing and overharvest of nesting females and their eggs.

7.  The green sea turtle (*Chelonia mydas*) is listed as threatened by the ESA, except for the population breeding on the Pacific coast of

Mexico, which is listed as endangered. 50 C.F.R. § 17.11. The green sea turtle is generally regarded as comprising two types, the eastern Pacific "black turtle" and the green turtle throughout the central and western Pacific. The species nests in Mexico, Central America, the Galapagos, Hawaii and in the South Pacific.

8.  The short-tailed albatross (*Phoebastria albatrus*) is listed as an endangered species by the ESA. 50 C.F.R. § 17.11. The short-tailed albatross is the largest of the seabirds of the North Pacific with a wingspan exceeding nine feet. The species currently breeds on only a handful of islands in Japan. Once numbering in the millions, the species now numbers approximately 1300 of the short-tailed albatross. The species was brought near extinction by feather hunters at the turn of the twentieth century.

We have jurisdiction under 28 U.S.C. § 1291.

## II

### Standard of Review

A district court's grant of summary judgment is reviewed de novo. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1507 (9th Cir.1995). De novo review of a district court judgment concerning a decision of an administrative agency means the court views the case from the same position as the district court. *Nevada Land Action Ass'n v. United States Forest Serv.,* 8 F.3d 713, 716 (9th Cir.1993). Judicial review of administrative decisions under the ESA is governed by Section 706 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under the APA, a court may set aside an agency action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990).

## III

### Statutory Framework

A.  High Seas Fishing Compliance Act

Prior to 1993, the United States had entered into numerous bilateral and multilateral agreements providing for the use and protection of various high seas fishery and marine resources. Many of these agreements provided for the protection of endangered and protected species. The restrictions that were imposed by these agreements were applicable only to vessels flagged by countries that were signatories to the agreements. In order to avoid the restrictions, many vessels reflagged in countries that were not party to these agreements.

In 1993, the United Nation's Food and Agriculture Organization addressed the problem of reflagging by negotiating the Agreement to Promote Compliance with International Conservation and Management Measures by Fishing Vessels on the High Seas (the "Agreement"). The Agreement required each party to "take such measures as may be necessary to ensure that fishing vessels entitled to fly its flag do not engage in any activity that undermines the effectiveness of international conservation and management measures."

In 1995, the United States enacted the High Seas Fishing Compliance Act ("Compliance Act"), for the purpose of implementing the "Agreement to Promote Compliance with International Conservation and Management Measures by Fishing Vessels on the High Seas" and "to establish a system of permitting, reporting, and regulation for vessels of the United States fishing on the high seas." 16 U.S.C. § 5501. The Compliance Act requires United States vessels to obtain permits to engage in fishing operations on the high seas, authorizes the Secretary of Commerce to promulgate regulations to implement the Act, proscribes unlawful activities, and establishes enforcement mechanisms. 16 U.S.C. §§ 5504–5506. Further, it imposes conditions and restrictions on the permits that are issued to fishing vessels. 16 U.S.C. § 5503.

B.  The Endangered Species Act

The Endangered Species Act ("ESA") was enacted in 1973 to prevent the extinction of various fish, wildlife, and plant species. The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The responsibility for administration and enforcement of the ESA lies with the Secretaries of Commerce and Interior, who have delegated

the responsibility to the Fisheries Service with respect to marine species, and to the Fish and Wildlife Service ("FWS") with respect to terrestrial species. 50 C.F.R. § 402.01.

■ Section 7(a)(2) of the ESA imposes a procedural duty on federal agencies to consult with either the Fisheries Service or the FWS before engaging in a discretionary action, which may affect listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.01(b). When the acting agency is either the Fisheries Service or the FWS, the obligation to consult is not relieved, instead, the agency must consult within its own agency to fulfill its statutory mandate. *See id.* The purpose of the consultation procedure is to allow either the Fisheries Service or the FWS to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction of its critical habitat, and if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. *See* 16 U.S.C. § 1536(b)(3)(A).[9]

## IV

## Analysis

■ As a threshold question, we must address whether the issuance of fishing permits by the Fisheries Service under the Compliance Act constitutes "agency action" implicating the ESA. *See Natural Resources Defense Council v. Houston,* 146 F.3d 1118, 1125 (9th Cir.1998). The term "agency action" has been broadly

defined encompassing "all activities or programs of any kind authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." *Id.* (citing 50 C.F.R. § 402.02). Examples include but are not limited to: "(b) the promulgation of regulations; [and] (c) the granting of licences, contracts, leases, easements, rights-of-way, permits, or grants-in-aid ..." 50 C.F.R. § 402.02. We conclude that the Fisheries Service issuance of fishing permits to boats to allow fishing on the high seas clearly constitutes "agency action" sufficient to trigger the protections of the ESA.

■ The Fisheries Service and the FWS jointly promulgated the ESA implementing regulations, which state in relevant part, that "Section 7 and the requirements of this part apply to all action in which there is *discretionary Federal involvement or control.*" 50 C.F.R. § 402.03 (emphasis added). This court has held that the discretionary control retained by the federal agency must have the ability to inure to the benefit of a protected species. *Environmental Prot. Info. Ctr. v. Simpson Timber Co.,* 255 F.3d 1073 (9th Cir.2001). If no discretion to act is retained, then consultation would be a meaningless exercise. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1509 (9th Cir.1995). Stated another way, "where there is no agency discretion to act, the ESA does not apply." *Natural Resources Defense Council,* 146 F.3d at 1125–26.

9. If a contemplated agency action may affect a protected species, then the "acting agency" must consult with either the Fisheries Service or the FWS, either formally or informally. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a)(4). The agency first prepares a biological assessment, in which it evaluates the potential effects of an action on the protected species and its critical habitat. 50 C.F.R. § 402.12(a). If the agency determines that its action is "likely to adversely affect" a protected species, it

must engage in formal consultation. *See id.* If the agency determines that its action is "not likely to adversely affect" a protected species, it may attempt informal consultation. *See* 50 C.F.R. § 402.13(a). In this case, where the Fisheries Service is itself the acting agency, the consultation would be with the same internal units of the Fisheries Service as would be involved with an outside acting agency.

▇ The district court found that there was not sufficient discretionary control retained by the Fisheries Service while issuing the permits to inure to the benefit of protected species. The district court recognized that "some" discretion was retained by the Fisheries Service but "[n]othing in the Compliance Act provides the Secretary [of Commerce] with the authority to place conditions on permits that inure to the benefit of protected species." *Center for Biological Diversity,* 2001 WL 1602707, at *3, 2001 U.S. Dist. LEXIS 20862 at *10. We disagree.

▇ "[I]t is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)(internal quotations omitted). It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. *Davis v. Michigan Dep't. of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). Applying these principles to the language of 16 U.S.C. § 5503(d), Congress used the phrase "including but not limited to" and in so doing, contemplated that the list of potential obligations that the United States had under the Agreement was not exhausted by those listed in the subsection. *See, e.g., Ramirez, Leal & Co. v. City Demonstration Agency,* 549 F.2d 97, 104 (9th Cir.1976)(the phrase "including but not limited to" is often used to mitigate the rule of statutory construction that general words are to be construed as only applying to a specific list); *In re*

*Forfeiture of $5,264,* 432 Mich. 242, 439 N.W.2d 246, 251–52 (1989) (inferring a broad construction from the use of "including but not limited to" language). Congress recognized that other obligations may exist and granted the Fisheries Service the discretion to determine what is necessary and appropriate to fulfill the United States' responsibilities.

▇ When interpreting a statute, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give[ ] effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Fisheries Service's interpretation of the Compliance Act as stated in its response to the Center's 60–day notice letter is not entitled to *Chevron* deference because it is contrary to the unambiguous language of the statute.[10] If given credence, the agency's interpretation effectively omits the "including but not limited to" language from the statute, as well as the clearly expressed intent of the statute, which was to comply with international conservation measures.

The plain language of the Compliance Act provides Fisheries Service with ample discretion to protect listed species. The intent of the Compliance Act was to implement the "Agreement to Promote Compliance with International Conservation and Management Measures by Fishing Vessels on the High Seas" and "to establish a system of permitting, reporting, and regulation for vessels of the United States fish-

---

**10.** Even if we were to find that the statute was ambiguous, we conclude that the Fisheries Service's interpretation of the Compliance Act is not entitled to *Chevron* deference. The Fisheries Service's interpretation was issued in response to the Center's 60–day notice letter. "Interpretations such as those in opinion letters—like interpretations contained in poli-

cy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *United States v. Mead,* 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

ing on the high seas." 16 U.S.C. § 5501. The "Conditions" subsection provides that "[t]he Secretary shall establish such conditions and restrictions on each permit issued under this section as are *necessary and appropriate* to carry out the obligations of the United States under the Agreement, *including but not limited to*" the markings of the boat and reporting requirements. 16 U.S.C. § 5503(d) (emphasis added).[11]

We hold that the Compliance Act is not ambiguous, and Congress's intent is clear from the plain language of the statute, therefore, we would not defer to the Fisheries Service's interpretation, even if the opinion letter were a document entitled to *Chevron*-style deference. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *United States v. Mead,* 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

As the implementing legislation for the Agreement, the Compliance Act expressly defines the term "international conservation and management measures" to mean "measures to conserve or manage one or more species of living marine resources." 16 U.S.C. § 5502(5). Among many others, one such measure is the Inter–American Convention for the Protection and Conservation of Sea Turtles which was designed to promote "the protection, conservation, and recovery of sea turtle populations and of the habitats on which they depend." The Sea Turtle Convention seeks to reduce to the greatest extent practicable the inci-

dental capture, retention, harm and mortality of sea turtles.

The district court and the Fisheries Service reliance on this court's holdings in *Sierra Club* and *Simpson Timber* is in error. In *Sierra Club,* a private timber company, pursuant to a right-of-way agreement with the Bureau of Land Management ("BLM"), sought to build a road on public land, which potentially impacted the northern spotted owl. 65 F.3d at 1509. The Sierra Club claimed that the agreement represented ongoing agency action and that the BLM was required to consult with the FWS about the potential impact of the road on a newly listed species, the spotted owl, because the BLM retained discretionary involvement and control over the right-of-way. *Id.* However, the BLM retained only limited discretion under the right-of-way agreement. The BLM could object to the timber company's project in only three limited instances, none of which was at issue or related to endangered or threatened species. We held that the BLM did not have a duty to consult with the FWS because under the existing agreement it could not influence construction of the roadway for the benefit of the newly listed spotted owl. *Id.*

In *Simpson Timber,* this court addressed whether the FWS retained sufficient discretionary control over an incidental take permit issued to Simpson Timber to require FWS to reinitiate consultation when two additional species found on

---

11. The permitting section of the Compliance Act, 16 U.S.C. § 5503(d) states in full:

The Secretary shall establish such conditions and restrictions on each permit issued under this section as are necessary and appropriate to carry out the obligations of the United States under the Agreement, including but not limited to the following: (1) The vessel shall be marked in accordance with the FAO Standard Specifications for the Marking and Identification of Fishing Vessels, or with regulations issued

under section 305 of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. § 1855); and
(2) The permit holder shall report such information as the Secretary by regulation requires, including area of fishing operations and catch statistics. The Secretary shall promulgate regulations concerning conditions under which information submitted under this paragraph may be released.

Simpson Timber's land were listed as threatened after the permit was issued. 255 F.3d at 1081. The plaintiff sued to enjoin logging until FWS reinitiated and completed consultation regarding the potential effect of Simpson's incidental take permit for the northern spotted owl on the newly listed marbled murrelet and coho salmon. The Court held that while the FWS retained certain discretion over Simpson Timber's activities, they did not "retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened." *Id.*

*Simpson Timber* and *Sierra Club* factually differ from the present case because they involve situations where the agency activity had been completed and there was no ongoing agency activity, therefore, the consultation requirements of the ESA were not invoked. Conversely, the Fisheries Service's continued issuance of fishing permits under the Compliance Act constitutes ongoing agency action, thus, under the plain language of the Compliance Act, discretion is retained by the federal agency.

More closely analogous is our decision in *Pacific Rivers Council v. Thomas*, in which we held that the Forest Service was obligated to consult with the Fisheries Service regarding the listing of the chinook salmon. 30 F.3d 1050, 1053 (9th Cir.1994). *Pacific Rivers* involved the Forest Service's Land Resource Management Plans, which established fifteen-year plans for government lands. We noted that the Management Plans "have an ongoing and long-lasting effect even after adoption" and, therefore, "represent ongoing agency action." *Id.* Similarly, the issuance of the Compliance Act permits has an ongoing and lasting effect and constitute ongoing agency activity, which is likely to adversely affect listed species. *See Houston,* 146 F.3d at 1128 (contract renewals

constitute ongoing agency activity invoking the consultation provisions of the ESA); *see also O'Neill v. United States,* 50 F.3d 677, 680–81 (9th Cir.1995) (consultation provision of ESA apply to preexisting water service contract under which the U.S. must act each year to supply the water).

The Compliance Act entrusts the Fisheries Service with substantial discretion to condition permits to inure to the benefit of listed species. Whether the Fisheries Service *must* condition permits to benefit listed species is not the question before this court, rather, the question before us is whether the statutory language of the Compliance Act confers sufficient discretion to the Fisheries Service so that the agency *could* condition permits to benefit listed species. We hold that the statute confers such discretion and because it does so, the ESA requires that the Fisheries Service conduct consultation to assess the potential impact to protected species.

## V

### Conclusion

In light of our holding that the issuance of permits under the Compliance Act is discretionary agency action, we reverse the district court and conclude that the Fisheries Service is required to conduct consultation to meet its obligations under Section 7 of the ESA. Further, we remand the claims brought under Section 9 of the ESA for further proceedings in light of our decision that the issuance of the permits constitutes discretionary agency action.

REVERSED AND REMANDED.