**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN WATERSHEDS PROJECT;
COMMITTEE FOR IDAHO'S HIGH
DESERT,
             *Plaintiffs-Appellees,*

                    v.

GEORGE MATEJKO, Supervisor,
Salmon-Challis National Forest;
UNITED STATES FOREST SERVICE;
RENEE SNYDER, BLM Challis Field
Office Manager; BUREAU OF LAND
MANAGEMENT; DAVID KROSTING,
BLM Salmon Field Office
Manager,
             *Defendants,*

                  and

STATE OF IDAHO,
    *Defendant-Intervenor-Appellant.*

No. 05-35178

D.C. No.
CV-01-00259-BLW

18079

WESTERN WATERSHEDS PROJECT;
COMMITTEE FOR IDAHO'S HIGH
DESERT,
             *Plaintiffs-Appellees,*

                  v.

GEORGE MATEJKO, Supervisor,
Salmon-Challis National Forest;
UNITED STATES FOREST SERVICE;
RENEE SNYDER, BLM Challis Field
Office Manager; BUREAU OF LAND
MANAGEMENT; DAVID KROSTING,
BLM Salmon Field Office
Manager,
             *Defendants-Appellants,*

                 and

STATE OF IDAHO,
             *Defendant-Intervenor.*

No. 05-35208

D.C. No.
CV-01-00259-BLW

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
October 21, 2005—Seattle, Washington

Filed July 24, 2006
Amended November 1, 2006

Before: Betty B. Fletcher and M. Margaret McKeown,
Circuit Judges, and Samuel P. King,* District Judge.

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

Opinion by Judge King

## COUNSEL

David C. Shilton, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for the defendants-appellants.

Clay R. Smith, Deputy Attorney General, Natural Resources Division, Boise, Idaho, for the defendant-intervenor-appellant.

Laurence J. Lucas, Boise, Idaho, for the plaintiffs-appellees.

L. Michael Bogert, Perkins Coie, Boise, Idaho, for amicus curiae Western Urban Water Coalition, Denver Water Board, Metropolitan Water District of Southern California, and City of Tucson Water Department.

Robin L. Rivett, Sacramento, California, for amicus curiae Pacific Legal Foundation.

## ORDER

The opinion filed on July 24, 2006, slip opinion at 8183 and published at 456 F.3d 922 (9th Cir. 2006) is amended as follows:

Page 8188 of the slip opinion, fourth line of the first full paragraph:

> replace "Fish and Wildlife Service (FWS)" with "United States Forest Service"

Page 8188 of the slip opinion, footnote one:

> replace "FWS" with "Forest Service"

Pages 8196-97, footnote five:

Add "These post-decision amendments are not part of our review." to the end of the footnote.

With these amendments, the panel has voted to deny the petition for rehearing.

No further petitions for rehearing or rehearing en banc may be filed.

---

**OPINION**

KING, District Judge:

Section 7(a)(2) of the Endangered Species Act (ESA), codified at 16 U.S.C. § 1536(a)(2), requires consultation with the Secretary of the Interior or Secretary of Commerce if there is "any action authorized, funded, or carried out by" a federal agency (here, the Bureau of Land Management (BLM)) that could jeopardize any endangered or threatened species, or destroy or adversely modify habitat of such species. This appeal presents the question of whether the BLM's failure to regulate certain vested rights-of-way held by private landowners to divert water for irrigation uses constitutes "action authorized, funded, or carried out" by the BLM so as to require consultation. The district court required the BLM to consult; it found the BLM had discretion to regulate the diversions and that its failure to exercise such discretion constituted "action." We conclude that the duty to consult is triggered by affirmative actions; because there was no such "action" here, there was no corresponding duty to consult. Accordingly, we reverse.

BACKGROUND

I.

Western Watersheds Project and Committee for Idaho's High Desert (collectively, Western Watersheds) filed this action in 2001 against the BLM and its regional officials, as well as the United States Forest Service, seeking declaratory and injunctive relief regarding hundreds of river and stream "diversions" (e.g., dams and pipes) on public lands in the Upper Salmon River basin of central Idaho.[1] Western Watersheds challenges the BLM's acquiescence in selected diversions for agricultural and other irrigation uses by private parties holding vested rights-of-way to divert water. It appears undisputed for purposes of this appeal that the diversions could jeopardize threatened species of fish.

Only count four (violation of section 7(a)(2) of the ESA) of the first amended complaint against the BLM is at issue on appeal; the parties agreed to litigate a set of six "test-case" diversions and focus on the legal issue of whether the BLM has a duty to consult under section 7(a)(2). The State of Idaho intervened and, along with the BLM, is an appellant.[2]

At issue are rights-of-way held by private parties to access and use water as "recognized and acknowledged by the local customs, laws, and the decision of courts" pursuant to the Act of July 26, 1866, 14 Stat. 253, codified at 43 U.S.C. § 661 (repealed in part Oct. 21, 1976) (the 1866 Act). Section 9 of the 1866 Act (also known as Revised Statute (R.S.) 2339 and R.S. 2340) provides in pertinent part as follows:

> Whenever, by priority of possession, rights to the
> use of water for mining, agricultural, manufacturing,

---

[1]The primary claims against the Forest Service settled.

[2]This opinion refers generally to the separate arguments of the BLM and the State of Idaho collectively as those of the BLM.

or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights *shall be maintained and protected* in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; . . . .

All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by this section.

*Id.* (emphasis added).

The 1866 Act embraced a doctrine of prior appropriation and a general policy of deference to state and local law regarding water rights. *See Hunter v. United States*, 388 F.2d 148, 151 (9th Cir. 1967).

Similarly, the Act of March 3, 1891, 26 Stat. 1095, codified in pertinent part at 43 U.S.C. § 946 (repealed Oct. 21, 1976) (the 1891 Act), provided for a vested federal right-of-way for irrigation upon approval of a map by the Secretary of the Interior. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 406-07 (1917). Like the 1866 Act rights-of-way, rights vested under the 1891 Act are perpetual unless the use changes. *See Kern River Co. v. United States*, 257 U.S. 147, 151-52 (1921) ("The approval, once given, could not be recalled . . . [unless by] a suit in equity . . . in the event the grantee ceased to use or retain the land for the purpose indicated in the act.") (citations omitted).

"The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use,

as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain." *Hunter*, 388 F.2d at 152 (quoting *California-Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 154-55 (1935)). That is, rights-of-way could be acquired well after 1866 and 1891. *See, e.g.*, *Grindstone Butte Project v. Kleppe*, 638 F.2d 100, 101 (9th Cir. 1981) (discussing irrigation rights-of-way approved in 1974 under the 1891 Act); *Adams v. United States*, 3 F.3d 1254, 1256 & 1260 (9th Cir. 1993) (affirming district court's holding that landowners possessed vested water rights-of-way under the 1866 Act, which were asserted in 1965 to 1968).

The six test-case diversions at issue here are on three streams or rivers in central Idaho: two on Big Timber Creek, three on the Pahsimeroi River, and one on Mahogany Creek. The Big Timber Creek's diversions are a "pipe diversion" and a "Carey Act diversion." The "pipe diversion" was established under the 1866 Act. The "Carey Act diversion" was apparently established under the 1891 Act. The three diversions on the Pahsimeroi River were vested under the 1866 Act. The diversion on Mahogany Creek is also from the 1866 Act. So, of the six test-case diversions, five were acquired under the 1866 Act and one under the 1891 Act. The district court assumed the diversions were 1866 Act rights-of-way for purposes of making its legal rulings.[3]

## II.

In 1976, Congress changed the statutory regime regarding rights-of-way by enacting the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701-1784 (1976). Effective October 21, 1976, the FLPMA replaced a "tangled array

---

[3]Western Watersheds questions whether the test-case diversions really are 1866 Act rights, but our review is limited to the district court's legal conclusions.

of laws granting rights-of-way across federal lands," with a single method for establishing a right-of-way over public lands. *United States v. Jenks*, 22 F.3d 1513, 1515 (10th Cir. 1994). Most important for present purposes, however, Congress specifically chose to preserve vested rights such as those under the 1866 and 1891 Acts. Section 509(a) of the FLPMA provides:

> Nothing in this subchapter shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted. However, with the consent of the holder thereof, the Secretary concerned may cancel such a right-of-way or right-of-use and in its stead issue a right-of-way pursuant to the provisions of this subchapter.

43 U.S.C. § 1769(a). *See also* 43 U.S.C. § 1701 historical note (a) ("[Section 701 of the FLPMA] provided that Nothing in this Act . . . , or in any amendment made by this Act, shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act . . .") *and* (h) ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights.").

In turn, the BLM issued a policy statement in 1983[4] declaring that "Ditches and canals constructed on public lands on or before October 21, 1976, under the authority of the 1866 Act will be recognized as an authorized use of the public land and no further action is required by either the holder of the vested water right or the [BLM]." It went on to guide that "any construction activities taking place after passage of FLPMA that

---

[4]The policy statement was issued after case law had determined (contrary to the BLM's position at the time) that acts such as the 1891 Act, and a similar 1901 Act, did not supercede or amend the 1866 Act. *See Grindstone Butte*, 638 F.2d at 103; *Hyrup v. Kleppe*, 406 F. Supp. 214, 217 (D. Colo. 1976).

significantly alter the alignment or relocate the *existing* facility require a right-of-way grant under Title V of FLPMA." (Emphasis in original).

The BLM promulgated consistent regulations in 1986 that provided:

> **Rights-of-way grants issued on or before October 21, 1976.**
>
> A right-of-way grant issued on or before October 21, 1976, pursuant to then existing statutory authority is covered by the provisions of this part *unless administration of this part diminishes or reduces any rights conferred* by the grant or the statute under which it was issued, in which event the provision of the grant or the then existing statute shall apply.

43 C.F.R. § 2801.4 (2004) (emphasis added).

> **Holder activity.**
>
> . . . .
>
> (b) Any *substantial deviation in location or authorized use* by the holder during construction, operation or maintenance shall be made only with prior approval of the authorized officer[.]

43 C.F.R. § 2803.2(b) (2004) (emphasis added).

After the district court issued its decision, the BLM completed major amendments to its rights-of-way regulations, effective June 21, 2005. *See* 70 Fed. Reg. 20970 (April 22, 2005). Among the many changes, the BLM issued a new regulation regarding the scope of its authority, similar to section 2801.4 quoted above:

The regulations in this part apply to:

. . . .

(3)   Grants issued on or before October 21, 1976, under then existing statutory authority, *unless application of these regulations would diminish or reduce any rights* conferred by the original grant or the statute under which it was issued. Where there would be a diminishment or reduction in any right, the grant or statute applies.

43 C.F.R. § 2801.6 (2005) (emphasis added); 70 Fed. Reg. at 21062.

The new regulations also replaced section 2803.2(b) with a section requiring a right-of-way holder to obtain BLM's approval before beginning a use or activity that "requires a substantial deviation from the grant." 43 C.F.R. § 2807.11(b) (2005); 70 Fed. Reg. at 21075. It continues: "You must obtain BLM's approval before you begin any activity that is a substantial deviation." *Id.*

Another new statement specifies that the BLM's regulations "do not apply to . . . Reservoirs, canals, and ditches constructed under the authority of [section 9 of the 1866 Act]." 43 C.F.R. § 2801.6(b)(6) (2005); 70 Fed. Reg. at 21062. The BLM did this "to clarify that the right-of-way regulations do not apply to existing rights for private reservoirs, ditches, and canals established prior to FLPMA under the Mining Act of July 26, 1866. We think this clarification will be helpful in eliminating any confusion associated with the previous regulatory language found in former section 2801.4." 70 Fed. Reg. at 20979. In so doing, it gave the following rationale:

This final rule therefore reflects long-standing law and BLM's historical practice by clarifying that 1866 Act rights-of-way are not subject to regulation

so long as a right-of-way is being operated and maintained in accordance with the scope of the original rights granted. Because rights-of-way under the 1866 Act are perpetual and do not require renewal, no authorization under FLPMA exists or is required in the future. Therefore, unless a right-of-way holder undertakes activities that will result in a substantial deviation in the location of the ditch or canal, or a substantial deviation in the authorized use, no opportunity exists for BLM to step in and regulate a right-of-way by imposing terms and conditions on the right-of-way's operation and maintenance. Simply stated, there is no current BLM authorization to which such terms and conditions could be attached. Therefore, Title V of FLPMA and BLM's right-of-way regulations do not apply to these rights-of-way.

This does not mean, however, that BLM cannot take action to protect the public lands when a holder of an 1866 Act right-of-way undertakes activities that are inconsistent with the original right-of-way. In such a situation, if the right-of-way holder does not approach BLM for a FLPMA permit authorizing such activities, FLPMA and BLM's trespass regulations provide BLM with the discretion to take an enforcement action against the right-of-way holder.

70 Fed. Reg. at 20980.

## III.

Section 7(a)(2) of the ESA requires a federal agency to initiate consultation as follows:

Each Federal Agency shall, in consultation with and with the assistance of the Secretary, insure that *any action authorized, funded, or carried out by such agency* . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]

16 U.S.C. § 1536(a)(2) (emphasis added).

In turn, FWS and NMFS (National Marine Fisheries Service) regulations provide:

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licences, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (2005).

In particular, a regulation states that "Section 7 and the requirements of this Part apply to all actions in which there is *discretionary Federal involvement or control.*" 50 C.F.R. § 402.03 (2005) (emphasis added).

IV.

After narrowing the scope of the litigation by designating the six test-case diversions, the parties filed cross-motions for summary judgment. The district court ruled in favor of Western Watersheds, determining that the BLM had discretion to impose conditions on the test-case diversions. It concluded that the ESA "requires the BLM to consult with the appropriate federal fish and wildlife agency over its decision not to impose conditions on certain water diversions." The court gave the term "action" in section 7(a)(2) "an expansive defini-

tion," and found an agency decision to "ignore actions by others" to be such action. It reasoned:

> There is no principled distinction between (1) a BLM decision to operate diversions across its lands that may affect Bull Trout; (2) a BLM decision to award a permit to a rancher who operates diversions across public lands that may affect Bull Trout; and (3) a BLM decision to ignore a rancher who operates diversions across public lands that may affect Bull Trout.

The district court also found the BLM's 1986 regulations and 1983 instruction memorandum to "constitute a continuing agency action — a decision not to impose conditions on diversions arising under the Act of 1866." In so holding, the court reasoned that the BLM had discretion to impose conditions on diversions arising under the 1866 Act. Such discretion meant that section 7(a)(2) applied under 50 C.F.R. § 402.03 ("Section 7 and the requirements of this Part apply to all actions in which there is discretionary Federal involvement or control"). Not only was the BLM required to consult under the ESA, the court went on to conclude "the BLM failed to perform a mandatory duty" and could be compelled to perform it under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1).

That is, the district court found the required action in the BLM's continued application of the BLM's regulatory interpretations made some 20 years ago — regulations requiring a "substantial deviation in either location or intended use" by the private users, 43 C.F.R. § 2803.2 (2004), before regulatory power arose.[5] The district court reasoned that the BLM

---

[5]As set forth earlier, the BLM rights-of-way regulations were amended wholesale effective June 21, 2005 — after the district court's decision. Among other things, the BLM promulgated an even clearer regulatory statement in 43 C.F.R. § 2801.6(b)(6) ("[BLM regulations do not apply to]

could have chosen to regulate the rights-of-way at issue, and thus had "discretionary federal involvement." It found the BLM "acted" either (1) by not exercising its residual discretion to regulate the rights-of-way, or (2) by continuing to follow the restrictive regulations themselves.

Following the grant of partial summary judgment in favor of Western Watersheds, the court entered an injunction ordering the BLM to initiate consultation within 180 days for three of the test-case diversions, and within 270 days for the remaining test-case diversions. The BLM and intervenor State of Idaho timely appealed from this injunction under 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

The Court reviews the decision to grant a permanent injunction for an abuse of discretion. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1176 (9th Cir. 2002). However, the rulings of law relied upon by the district court are reviewed de novo. *Id.*

Judicial review of administrative decisions under the ESA is governed by the APA. "Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " *Turtle Island Restoration Network v. Natl Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003) (citation omitted).

## DISCUSSION

**[1]** The appeal turns on whether the BLM's failure to exercise any discretion it might have had to regulate the diversions

---

Reservoirs, canals, and ditches constructed under the authority of [section 9 of the 1866 Act]"). *See* 70 Fed. Reg. at 20980 ("1866 Act rights-of-way are not subject to regulation so long as a right-of-way is being operated and maintained in accordance with the scope of the original rights granted"). These post-decision amendments are not part of our review.

at issue in this appeal constitutes a BLM "action" that "authorizes, funds, or carries out" the diversions. The question is whether such a failure to exercise discretion (assuming the BLM had discretion) is an "agency action" for purposes of section 7(a)(2), so as to require consultation.

**[2]** Our answer is no. We start with the plain language of section 7(a)(2), which refers to "agency action" as "any action authorized, funded, or carried out by such agency." Of particular significance is the affirmative nature of these words — "authorized, funded, carried" — and the absence of a "failure to act" from this list. This stands in marked contrast to other sections of the ESA, which explicitly refer to an agency's failure to act. *See, e.g.*, § 1540(g)(1)(C) (authorizing citizen suits "where there is alleged a *failure of the Secretary to perform any act or duty* . . . which is not discretionary[.]") (emphasis added).[6]

Both sides look to the ESA regulations for support. The regulations define "action" to mean "all activities or programs *of any kind* authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States . . . [.]" 50 C.F.R. § 402.02 (2004) (emphasis added). Western Watersheds emphasizes "of any kind" and argues that a decision not to regulate fits such broad language. In response, the BLM points to the examples given in the regulation, which are affirmative — e.g., "the promulgation of regulations" and "the granting of . . . rights-of-way." *Id.*

Although the term "agency action" is to be construed broadly, *see Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998), Ninth Circuit cases have emphasized that section 7(a)(2) consultation stems only from "affir-

---

[6]The actions cannot be the private diversions themselves. The statute plainly refers to "*agency* action"; it says "any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize . . . [.]" 16 U.S.C. § 1536(a)(2).

mative actions." This point was recently reiterated in *Defenders of Wildlife v. EPA*, 420 F.3d 946 (9th Cir. 2005). *Defenders of Wildlife* repeatedly emphasized that section 7(a)(2) consultation stems from "affirmative" actions only. It found a duty to consult under section 7(a)(2) in an EPA decision to approve a transfer of a Clean Water Act permitting program from federal to state control. Most important for present purposes, the opinion studied section 7(a)(2), analyzed Ninth Circuit case law, and emphasized (over and over) that "action" under section 7(a)(2) must be "affirmative." *Id.* at 967 ("section 7(a)(2) specifies that agencies must *when acting affirmatively* refrain from jeopardizing listed species") (emphasis in original).

**[3]** Interpreting section 7(a)(2), the opinion explained that "the [ESA] confers authority and responsibility on agencies to protect listed species when the agency engages in an *affirmative* action that is both within its decisionmaking authority and unconstrained by earlier agency commitments." *Id.* (emphasis added). The "language does indicate that some agency actions are not covered — those the agency does *not* 'authorize[ ], fund[ ], or carr[y] out.' " *Id.* (emphasis and alterations in original). It restates the question as whether agencies must "protect listed species from the impact of *affirmative* federal actions." *Id.* at 970 (emphasis added). It characterizes section 7(a)(2) as "a do-no-harm directive pertaining to *affirmative* agency action with likely adverse impact on listed species." *Id.* (emphasis added). It held that the approval of the transfer of Clean Water Act permitting authority triggered section 7(a)(2)'s "consultation requirement and its mandate that agencies not *affirmatively* take actions that are likely to jeopardize listed species." *Id.* at 971 (emphasis added). In short, *Defenders of Wildlife* provides that "inaction" is not "action" for section 7(a)(2) purposes. That is, even assuming the BLM could have had some type of discretion here to regulate the diversions (beyond a "substantial deviation"), the existence of such discretion without more is not an "action" triggering a consultation duty.

This position is consistent with prior cases. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1511 (9th Cir. 1995) (reasoning that "a BLM 'action' will implicate section 7(a)(2) only if it legitimately authorizes [private] activity" and concluding that the BLM's issuance of an "approval" letter for a road right-of-way could not be construed as an "authorization" triggering a duty to consult); *and Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074-75 (9th Cir. 1996) (finding section 7(a)(2) inapplicable where the responding agency "merely provided advice" on how to avoid a "take" but did not act to "authorize, fund or carry out" challenged tree-harvesting operations).

The BLM's challenged "action" stands in marked contrast to cases involving truly "affirmative" actions. *See Turtle Island Restoration Network*, 340 F.3d at 977 (holding that section 7(a)(2) applies to the "continued issuance of fishing permits") *and Houston*, 146 F.3d at 1125-26 (reasoning that section 7(a)(2) applies to negotiating and executing water contracts, where agency was not bound to reaffirm previously negotiated terms).

**[4]** Here, the BLM did not *fund* the diversions, it did not *issue* permits, it did not *grant* contracts, it did not *build* dams, nor did it *divert* streams.[7] Rather, the private holders of the vested rights diverted the water, beginning a long time ago. The BLM did not affirmatively act and was "not an entity responsible for [the challenged] decisionmaking." *Defenders of Wildlife*, 420 F.3d at 968 (citing *Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1033 (9th Cir. 2005)).

Western Watersheds would find "affirmative" action in the BLM's continuing decision not to enforce its regulatory discretion. In this regard, 50 C.F.R. § 402.03, provides "Section 7 and the requirements of this Part apply to all actions in which there is discretionary Federal involvement or control."

---

[7]In contrast, the record indicates that when the BLM directly funded a diversion in 1999, it formally consulted with the FWS.

Assuming the BLM had some "discretionary" authority over 1866 and 1891 rights-of-way, the "action" is — according to Western Watersheds — the act of continuing to follow a policy expressed in then-existing BLM regulations promulgated in 1986 (43 C.F.R. § 2803.2(b) (2004)), which restrict the BLM's power unless there is a "substantial deviation in location or authorized use" of a vested right-of-way.

**[5]** It is true that "[w]here the challenged action comes within the agency's decisionmaking authority *and remains so*, it falls within section 7(a)(2)'s scope." *Defenders of Wildlife*, 420 F.3d at 969 (emphasis added). However, there is no "ongoing agency action" where the agency has acted earlier but specifically did not *retain* authority or was otherwise constrained by statute, rule, or contract. For example, in *Environmental Protection Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001), the Ninth Circuit found no section 7(a)(2) consultation requirement where the FWS had already issued a permit but had not retained discretion to amend it to protect endangered species. There was no "ongoing agency involvement" because the FWS had not "retained the power to 'implement measures that inure to the benefit of the protected species.' " *Id.* at 1080 (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995)). In *Sierra Club*, section 7(a)(2) did not apply because — like here — the BLM had "no ability to influence" a project based on a right-of-way granted before the ESA was enacted. 65 F.3d at 1509.

On the other hand, there was such "continuing decision-making authority" in *Washington Toxics*, where the EPA had a continuing duty "to register pesticides, alter pesticide registrations, and cancel pesticide registrations" under the Federal Insecticide, Fungicide and Rodenticide Act. 413 F.3d at 1033. "Ongoing agency action" also existed in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994), where the Forest Service maintained continuing authority under a comprehensive and long term management plan, that was still in effect. And in *Turtle Island Restoration Network*, the Ninth

Circuit found the requisite residual discretionary authority where the NMFS had retained discretion in its previously-granted fishing permits specifically to protect species. 340 F.3d at 977. In those types of cases, there is a duty to consult.

[6] Here, even if the BLM could have regulated the diversions to protect endangered species, it did not retain such discretion. As the 1983 instruction memorandum, the 1986 regulations, and the recently-enacted 2005 regulatory amendments make clear, the only discretion the BLM retained is to regulate the pre-1978 diversions if there is a "substantial deviation in use or location." The BLM has the ability to institute enforcement or trespass actions if a right-of-way holder "substantially deviates" and does not obtain BLM approval. *See* 43 U.S.C. § 1733 and 43 C.F.R. § 2808.11 (2005); 70 Fed. Reg. at 21078. It also has the ability to institute an ESA § 9 (16 U.S.C. § 1538) "taking" action to prevent harm. But even this power is not ongoing "discretionary involvement or control" within the meaning of 50 C.F.R. § 402.03. *See Marbled Murrelet*, 83 F.3d at 1074 ("there is no evidence that the USFWS had any power to enforce those conditions other than its authority under section 9 of the ESA, and this is not enough to trigger 'federal action' under section 7"). In short, the BLM has no retained power to "inure to the benefit of the protected species." *Sierra Club*, 65 F.3d at 1509.[8]

---

[8]This is not to say that the BLM could not have had discretionary authority or power to regulate the rights-of-way in the manner advanced by Western Watersheds, and still be consistent with the FLPMA. We need not decide that question. In some respects the 1983 policy statement and 1986 and 2005 regulations clarify that the BLM *does* have power — despite section 509(a) of the FLPMA, 43 U.S.C. § 1769(a) — to regulate pre-FLPMA rights of way *if* a user "substantially deviates" from a vested use. But even if the BLM could have had greater discretion, it did not retain authority beyond "substantial deviations" in use. That is, even if the FLPMA could be interpreted to have allowed the BLM some discretion to regulate pre-FLPMA rights-of-way, the BLM did not retain such authority (other than for "substantial deviations"). Thus, there is no "ongoing agency action."

**[7]** This is not a lawsuit to "compel agency action" under § 706(1) of the APA. Nor can this be a suit challenging BLM's general policies on when or how to regulate pre-FLPMA rights-of-way because such a "programmatic challenge" to agency policy is improper. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, the respondent must direct its attack against some particular 'agency action' that causes it harm"). A "failure to regulate" claim must be based upon a clearly imposed duty to take some discrete action. *Southern Utah Wilderness Alliance v. Norton*, 542 U.S. 55, 64 (2004). Rather, this is a narrow suit (at least the single count now on appeal) limited to attempting to compel the BLM to initiate consultation under section 7(a)(2) of the ESA. We conclude that such a challenge fails.[9]

## CONCLUSION

Because the test-case diversions did not result from affirmative BLM actions authorizing, funding, or carrying out the activity, there is no duty to consult. Even if the BLM could have retained the power to regulate the pre-FLPMA diversions, its determination made years ago to limit such power is not an "ongoing agency action."

**REVERSED.**

---

[9]As both sides acknowledge, Western Watersheds or others can file an action under section 9 of the ESA (16 U.S.C. § 1538) against particular diversions to halt "takings" of threatened species, if the diversions jeopardize fish or their critical habitat — something Western Watersheds did earlier against the same type of diversions at issue here. Of course, such section 9 suits differ from the type of agency enforcement contemplated by Western Watersheds. Our review, however, is limited to the statutory question under section 7(a)(2).