# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KARUK TRIBE OF CALIFORNIA,
          *Plaintiff-Appellant,*

          v.

UNITED STATES FOREST SERVICE;
MARGARET BOLAND,
          *Defendants-Appellees,*

THE NEW 49'ERS, INC.; RAYMOND
W. KOONS,
  *Defendants-Intervenors-Appellees.*

No. 05-16801

D.C. No.
CV-04-04275-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
July 13, 2010—San Francisco, California

Filed April 7, 2011

Before: William A. Fletcher and Milan D. Smith, Jr.,
Circuit Judges, and James D. Todd, Senior District Judge.*

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge William A. Fletcher

---

*Senior United States District Judge for the Western District of Tennessee, sitting by designation.

4643

## COUNSEL

Roger Flynn (argued) and Jeffrey C. Parsons, Western Mining Action Project, Lyons, Colorado, for plaintiff-appellant Karuk Tribe of California.

John C. Cruden (argued), Acting Assistant Attorney General, Washington, D.C.; Andrew C. Mergen, David C. Shilton, and Lane N. McFadden, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.; Andrew R. Varcoe and Rose Miksovsky, Office of the General Counsel, United States Department of Agriculture, Washington, D.C., for defendants-appellees United States Forest Service, et al.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon, for defendants-intervenors-appellees The New 49'ers, et al.

## OPINION

M. SMITH, Circuit Judge:

Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), requires interagency consultation for any federal agency action that may affect a listed species. In this opinion, we determine whether a United States Forest Service (USFS) District Ranger's (Ranger) decision that a proposed mining operation may proceed according to the miner's Notice of Intent (NOI) and will not require a Plan of Operations (Plan) is an "agency action" for purposes of triggering the ESA's interagency consulting obligations.

We hold that the NOI process does not constitute an "agency action," as that term is defined under the ESA. The Ranger's receipt of an NOI and resulting decision not to require a Plan is most accurately described as an agency decision *not* to act. Because " 'inaction' is not 'action' for section 7(a)(2) purposes," *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006), we affirm the district court's denial of summary judgment on the Tribe's ESA challenge to the NOI process.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Gold and Silver Salmon

The Klamath River (River) runs from Oregon, through California, to the Pacific Ocean. As it winds through Northern California, it crosses through the lands that have been home to the Plaintiff-Appellant Karuk Tribe of California (the Tribe) since time immemorial. The River is a designated critical habitat of the Coho, or silver, salmon[1] and various other fish species, and is a source of cultural and religious significance to the Tribe, who depend upon it for the fish and other subsistence uses.

---

[1]The Coho salmon was listed as "threatened" in 1997, 62 Fed. Reg. 24,588 (May 6, 1997), and the River was designated as critical habitat for the Coho salmon in 1999, 64 Fed. Reg. 24,049 (May 5, 1999). The New 49'ers assert that the district court improperly ignored the fact that the listing was invalid. The New 49'ers base this argument on the transcript of proceedings taken in *California States Grange v. Department of Commerce*, No. 02-CV-6044-HO (D. Or. Jan. 11, 2005), in which a district court declared the Coho salmon listing unlawfully promulgated under the Administrative Procedure Act (APA), in light of another district court decision, *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1163 (D. Or. 2001). However, despite its concerns, the district court left the listing in place because doing so was consistent with the purpose of the ESA. There is nothing in section 7 requiring that a listing be unassailable in order for consultation to be required as to a listed species.

The River also contains gold deposits. As erosion and other natural processes loosen gold from hard rock in and around the River, the gold travels downstream and settles at the bottom, underneath the lighter sediments but above the bedrock. One method of retrieving this gold is by using a suction dredger, a machine that vacuums a small area of the riverbed and extracts the gold from the other sediments. Because the precise mechanics of suction dredging are not relevant to our disposition and are ably described in *Siskiyou Regional Education Project v. Rose*, 87 F. Supp. 2d 1074, 1081-82 (D. Or. 1999), and other decisions cited herein, we do not repeat them here. Suffice it to say that suction dredgers are mechanical equipment, and accordingly, may not be used on federal forest lands without formally notifying the USFS, *see* 36 C.F.R. § 228.4(a) (2004).[2] The suction dredge mining activity conducted by the individual gold miners represented in this suit by the Defendants-Intervenors The New 49'ers is best described as small-scale suction dredge gold mining (a few cubic inches at a time) performed for recreational purposes.

The Tribe contends that even small-scale suction dredge mining, especially when conducted by sufficient numbers of people with sufficient frequency, significantly disturbs surface resources and destroys aquatic habitat. In particular, the Tribe offers expert evidence that suction dredging kills salmonid and other fish eggs, kills fish food sources, destabilizes riverbed areas used for spawning, and otherwise disturbs the fish and their reproductive activities. The New 49'ers disagree, and contend that there is no evidence that the very small-scale suction dredging at issue in this case causes any harm to the Coho salmon.[3] Because the standard for ESA con-

---

[2]Because the challenged NOI decisions were made in 2004, we rely upon the 2004 version of the regulation.

[3]The New 49'ers argue that the district court improperly excluded certain extra-record evidence that shows that small-scale suction dredge mining is not harmful to fish. "This circuit has only allowed extra-record materials: (1) if necessary to determine 'whether the agency has consid-

sultation is only whether the conduct "may affect" a listed species, *see Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994), the district court did not resolve this factual dispute, and neither must we. We assume the Tribe has established that suction dredge mining may affect the Coho salmon. *See Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 550 & n.2 (9th Cir. 2009). In fact, the Tribe, the USFS, and The New 49'ers met for the purpose of discussing what criteria the USFS should consider when deciding whether a Plan will be required for a proposed suction dredge operation. Most of the discussion at that meeting centered on what those miners who do not want to have to submit a Plan should do to avoid disturbing fish and aquatic habitat, suggesting that the USFS would admit that at least some suction dredging activities "may affect" the Coho salmon.

## II. Statutory and Regulatory Background

The Organic Administration Act, 16 U.S.C. §§ 473-78 (1897) (the Organic Act), provides that federal forest lands

---

ered all relevant factors and has explained its decision,' (2) 'when the agency has relied on documents not in the record,' or (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter.' " *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443,1450 (9th Cir. 1996) (quoting *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996)). It is usually inappropriate for a district court to consider extra-record evidence offered merely to rebut the merits of an agency's findings. *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted[.] . . . If the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits."). Here, not only were the disputed documents offered merely to rebut the merits of the USFS's decision concerning the risks to species from suction dredging, the merits of that decision are not even relevant to the purely legal question at issue here. Accordingly, the district court did not abuse its discretion in striking The New 49'ers' proffered materials.

are subject to the United States mining laws, including the General Mining Law of 1872, 30 U.S.C. § 22, *as amended by* 30 U.S.C. § 612. Under the mining laws, citizens are entitled to enter public lands for the purpose of prospecting and removing mineral deposits. The Organic Act further provides that prospectors and miners entering federal forest lands "must comply with the rules and regulations covering such national forests." 16 U.S.C. § 478. The government's regulatory authority (vested in the Secretary of Agriculture and, derivatively, the USFS), however, does not go so far as to permit it to "*prohibit* any person from entering upon such national forests for all proper and lawful purposes including that of prospecting, locating, and developing the mineral resources thereof." *Id.* (emphasis added). Indeed, "[e]xercise of th[e] right [to enter federal lands for prospecting] *may not be unreasonably restricted*." National Forests Surface Use Under U.S. Mining Laws, 39 Fed. Reg. 31,317 (Aug. 28, 1974) (hereinafter Forests Use Under Mining Laws) (emphasis added).

The Organic Act thus creates a regulatory scheme whereby the USFS may regulate mining activity on federal forest lands "to preserve the forests thereon from destruction," 16 U.S.C. § 551, but may not otherwise interfere with or prohibit the activities permitted under the mining laws. *See Siskiyou*, 565 F.3d at 557-58. To achieve an appropriate balance between mining rights and environmental preservation, the USFS promulgated regulations, which are the source of the present controversy.

The relevant regulations, set forth as 36 C.F.R. § 228.4(a), outline a three-tiered approach to regulating mining in the national forests. The regulatory scheme is based on the touchstone "disturbance of surface resources." 36 C.F.R. § 228.4(a).[4]

---

[4]The current version is slightly different in that it adds that the disturbance must be "significant" in order to require an NOI to be filed. *See* 36 C.F.R. § 228.4(a) (2010). This difference is immaterial for our purposes. *See Siskiyou*, 565 F.3d at 550 n.3 ("The revised regulations retain the basic requirements of the earlier version, and do not materially affect suction-dredge mining.").

The regulations first describe certain de minimis activities, such as gold panning, that citizens may conduct without involving the USFS. *See id.* § 228.4(a)(1) (listing activities that require no notice to the USFS, including use of existing roads, mineral sampling, marking out a mining claim, and other activities that "will not cause significant surface resource disturbance"). Second are activities that "might cause disturbance of surface resources." *Id.* § 228.4(a). The person intending to engage in such an activity must submit a "notice of intent to operate" to the Ranger—an NOI. Third are activities that are "likely [to] cause significant disturbance of surface resources." *Id.* These activities require a Plan, which may include, among other things, specific conditions requiring the proposed operator to ensure environmental preservation. Operations requiring a Plan cannot be conducted until the Ranger approves the Plan. *See id.* § 228.5.

Upon receipt of an NOI, the Ranger decides, within his discretion, whether the activities described in the NOI are likely to significantly disturb surface resources and will consequently require a Plan to be submitted for the USFS's approval. 36 C.F.R. § 228.4(a); *Siskiyou*, 565 F.3d at 551. When the USFS clarified its regulations in 2005, it explained that:

> The requirement for prior submission of a notice of intent to operate alerts the Forest Service that an operator proposes to conduct mining operations on [National Forest Service (NFS)] lands which the operator believes might, but are not likely to, cause significant disturbance of NFS surface resources and gives the Forest Service the opportunity to determine whether the agency agrees with that assessment such that the Forest Service will not exercise its discretion to regulate those operations.

Clarification as to When a Notice of Intent To Operate and/or Plan of Operation Is Needed for Locatable Mineral Opera-

tions on National Forest System Lands, 70 Fed. Reg. 32,713, 32,720 (June 6, 2005) (hereinafter NOI Clarification). In other words, the purpose of submitting an NOI is "to provide the Forest Service District Ranger with sufficient information to determine if the level of disturbance will require a Plan and a detailed environmental analysis." U.S. Forest Serv., *Notice of Intent Instructions: 36 CFR 228.4(a) — Locatable Minerals*, http://www.fs.fed.us/geology/noi_instructions.doc (last visited Mar. 31, 2011). The NOI need include only (1) the name, address, and telephone number of the operator; (2) the area involved; (3) the nature of the proposed operations; (4) the route of access to the area; and (5) the method of transport to be used. *Id.*; *see also* 36 C.F.R. § 228.4(a)(2). There is no requirement that an NOI include any statement of planned environmental protection measures.[5]

If the Ranger concludes that the NOI describes an activity likely to cause significant disturbance of surface resources, the Ranger must "notify the operator if approval of a plan of operations is required before the operations may begin." 36 C.F.R. § 228.4(a)(2). The Ranger's notice must be given within fifteen days of receiving the NOI. *Id.* If the Ranger does not request a Plan, then the mining operations may proceed. *See id.*

## III.   The NOIs at Issue in this Appeal

In this appeal, the Tribe challenges the USFS's decision to "accept" four NOIs without consulting with other agencies about the biological effects of the miners' conduct. Importantly, the Tribe does *not* argue that the Ranger abused his

---

[5]Given that the Ranger considers the environmental impact of the proposed mining operation in deciding if significant surface resource disturbance is likely, however, some of the longer NOIs do include details about certain environmental factors (such as location and season) that the operator plans to account for in order to avoid significantly disturbing surface resources.

discretion in deciding that the activities described in these NOIs did not require a Plan, or that the USFS breached its ESA consultation obligations by adopting the regulatory scheme described *supra*.[6]

The first NOI at issue is a May 24, 2004 NOI submitted by Dave McCracken, General Manager for The New 49'ers. This NOI notified the USFS of multiple small-scale suction dredge mining operations members of The New 49'ers planned to conduct over a 35-mile river and stream area. Each dredge was estimated to affect about one quarter of a cubic yard of the river, limited to no more than ten dredges per mile in the River proper and three dredges per mile in its tributaries. The NOI specifically mentioned that the miners would avoid a handful of places along the River to guard against disturbing certain cold water refugia used by fish in the warmer summer months. After receiving and reviewing McCracken's NOI, on May 25, 2004, the Ranger sent a letter to McCracken explaining that he had "determined that [McCracken and The New 49'ers'] proposed operations would not require a Plan of Operations." The "authorization" was set to expire on December 31, 2004.

The second challenged NOI was submitted to the USFS on May 29, 2004 by Nida Jo Lawson Johnson. Johnson's NOI described her activities as using a six-to-eight inch dredger to

---

[6]The Dissent concludes in part that the USFS's "actions" included "formulating criteria" that "governed the approval or denial of NOIs for suction dredge mining." Dissent at 4693. However, the Tribe does not contend on appeal that the Ranger's creation of an informal (albeit detailed) document constitutes a challenged "action" during which the USFS should have engaged in ESA consultations. The Dissent's analysis therefore violates the well-established tenet that "[w]e review only issues which are argued specifically and distinctly in a party's opening brief. . . We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009) (internal quotation marks omitted).

make four-to-five inch dredges. She also indicated that she would not conduct dredging activities near the mouths of certain tributaries. The Ranger responded that the described mining operations "would not require a Plan of Operations." The Ranger stated that the NOI would "expire" on December 21, 2004.

Third, the Tribe challenges Robert Hamilton's June 2, 2004 NOI. Hamilton sought to use a four-inch suction dredger, restricted to a two-and-a-half inch opening, to mine for gold in up to twenty cubic yards of riverbed, between July 12 and July 23, 2004. The Ranger's June 15 response was nearly identical to his response to Johnson's NOI.

Finally, the last challenged NOI was submitted on June 14, 2004 by Ralph Easley. Easley proposed to use a four-inch dredge for recreational purposes between July 1, 2004 and September 30, 2004. The Ranger responded with the same form letter sent to Johnson and Hamilton, explaining that no Plan was required for Easley's planned operations, and that the NOI would expire on December 31, 2004.

## IV.  The Summary Judgment Motion

The Tribe filed suit against the USFS for various claims alleging violations of the National Forest Management Act, the National Environmental Policy Act (NEPA), and the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071 (N.D. Cal. 2005). The district court denied summary judgment on all grounds. The Tribe appeals only the ESA claim.

The district court rejected the Tribe's argument that the USFS's review of an NOI constitutes an "authorization" of mining activity. *Id.* at 1101. Given that the miners, not the USFS, conduct the mining activities, that the NOI process is more like a review than an authorization, and that the mining laws confer a statutory right on the miners to prospect, subject

only to limited agency interference, the district court found that the Tribe failed to meet its burden to show that the NOI process is equivalent to the sort of affirmative agency action required to trigger ESA consulting obligations. *Id.* The district court subsequently entered its final judgment in favor of the USFS.

## JURISDICTION AND STANDARD OF REVIEW

Summary judgment is appropriate when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007).

Although denial of summary judgment is ordinarily not appealable, we have jurisdiction under 28 U.S.C. § 1291, as the district court's order denying summary judgment fully resolved all of the legal issues in the case and resulted in the district court's entry of final judgment in favor of the USFS. *See Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1138 (9th Cir. 2001), *cert. granted and opinion vacated on other grounds*, 539 U.S. 901 (2003). We review the district court's denial of summary judgment de novo. *Id.* at 1136-37. We also review questions of statutory interpretation de novo. *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1399 (9th Cir. 1995).

## DISCUSSION

**[1]** Section 7 of the ESA provides, in pertinent part:

Each Federal agency shall, in consultation with and with the assistance of [U.S. Fish and Wildlife Service (USFWS) or other relevant agency], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threat-

ened species or result in the destruction or adverse modification of habitat of such species . . . .

16 U.S.C. § 1536(a)(2). Consultation is designed "to allow [USFWS, in this case,] to determine whether [a] federal action is likely to jeopardize the survival of a protected species or result in the destruction of its critical habitat, and if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) (citing 16 U.S.C. § 1536(b)(3)(A)). When consultation is required, the agency begins by preparing a "biological assessment" or engaging in an "informal consultation." 50 C.F.R. § 402.14(b)(1).[7] The agency uses the biological assessment or materials gathered during informal consultation to determine whether its action is "likely to adversely affect" a listed species. *Turtle Island*, 340 F.3d at 974 n.9 (citing 50 C.F.R. § 402.12(a)). The likelihood of adverse effects, as determined by the biological assessment, dictates whether further consultation with USFWS must occur. *Id.* (citing 50 C.F.R. § 402.13(a)).

**[2]** To trigger the consultation duty, there must be a qualifying federal agency action. "Agency action" for ESA purposes is defined by regulations promulgated by the Secretaries of Commerce and the Interior:

> Action means all *activities or programs* of any kind *authorized, funded, or carried out*, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regu-

---

[7]The New 49'ers contend that interagency consultation *did* occur. However, "[b]ecause these arguments were not raised before the district court, they are waived." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1063 n.3 (9th Cir. 2007).

lations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (emphases added).[8] Although "agency action" is construed broadly, it does not encompass everything an agency does related to planned *private* activity. As we explained in *Sierra Club v. Babbitt*, 65 F.3d 1502, 1510 (9th Cir. 1995), "Congress specifically limited the application of section 7(a)(2) to cases where the federal agency retained some measure of control over the private activity." Congress intended that the "discrete burdens [of the ESA] properly fall on a private entity *only to the extent the activity is dependent on federal authorization.*" *Id.* at 1512 (emphasis added).[9]

---

[8]Further, interagency consultation is required only for "actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added): *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 664-65 (2007). Our case law may not be a model of clarity when it comes to separating our inquiries into whether an action is a qualifying "agency action," 50 C.F.R. § 402.02, as well as one in which the agency has "discretionary Federal involvement or control," 50 C.F.R. § 402.03. Often, when an agency is empowered to authorize an activity, it will have discretion over that decision, making the inquiries necessarily overlap and showing that the section 7 duty obviously applies. *See, e.g.*, *Turtle Island*, 340 F.3d 969.

In this case, we agree with the Dissent that the USFS exercises "discretion" in deciding whether to request a Plan on a case-by-case basis. *See* Dissent at 4675-77, 4695 (citing NOI Clarification, 70 Fed. Reg. at 32,728); *see also Siskiyou*, 565 F.3d at 551. However, 50 C.F.R. § 402.03 makes clear that the ESA consultation obligation is only triggered if a discretionary "*action*" is involved. 50 C.F.R. § 402.03 (emphasis added). As described in greater detail *infra*, absent an "agency action" as defined by 50 C.F.R. § 402.02, the consultation obligation is not triggered.

[9]At oral argument, it was suggested that the USFS's decision with respect to an NOI is an "agency action" for purposes of the ESA because in *Siskiyou*, 565 F.3d at 554, we concluded that such a decision is a "final agency action" for purposes of the APA, 5 U.S.C. § 704. However, the standard for "agency action" under the ESA (articulated supra) is distinct

**[3]** Here, the activities described in an NOI are neither funded by the USFS nor carried out by the USFS. They are carried out by private parties, such as the individual members of The New 49'ers. The Tribe thus bears the burden of showing that the activities described in an NOI are "authorized" by the USFS.

The Tribe contends that filing an NOI is a legal prerequisite to conducting the mining activities described therein, and that accordingly, the Ranger's decision to allow the suction dredging activities described in the NOI is an agency authorization of the activities. *See Turtle Island*, 340 F.3d at 977 (finding agency action under ESA where NMFS issued permits pursuant to the High Seas Fishing Compliance Act and had "substantial discretion to condition permits to inure to the benefit of listed species"); *see also Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 302 (1st Cir. 1999) (collecting cases in which various circuits have held that there is an agency action for NEPA purposes when the private activity cannot go forward without federal approval and the federal agency has some discretionary authority over the outcome). The Tribe also points to the USFS's response to McCracken's NOI, in which the USFS notified McCracken of its "authorization" of his NOI. In addition, the Tribe relies on evidence showing that the Ranger can monitor suction dredge mining conducted pursuant to an NOI much the same as he monitors activities conducted pursuant to a Plan. This, the Tribe contends, shows that the Ranger has discretionary involvement or control over the mining operations. The Tribe also emphasizes that the Ranger is able to influence proposed activities for the benefit of species even under an NOI by

from the standard under the APA; under the APA, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotation marks omitted).

demanding changes to an NOI to ensure there is no significant disturbance of surface resources.

The USFS responds that it has no power to "authorize" mining activities described in an NOI because the miners already possess the right to mine under the mining laws, and that the permits to engage in such mining are granted by other state and federal bodies.[10] While the USFS has some power to require miners to seek its approval and submit to reasonable USFS regulation, such power only materializes once the USFS determines that the activity is likely to cause significant disturbance of surface resources. The USFS concedes that ESA consultation is required before it can approve a Plan, but argues that the Ranger's decision *not* to require a Plan for the proposed activities is essentially a decision *not* to act and a recognition of its lack of discretionary authority over the pro-

---

[10]The New 49'ers direct our attention to California Senate Bill No. 670 (Aug. 5, 2009), which amends California Fish and Game Code § 5653. The new section, Cal. Fish & Game Code § 5653.1, requires an environmental impact report to be prepared prior to issuance of any suction dredging permits. This statutory section was added pursuant to a court order and consent judgment entered in a state court action brought by the Tribe against the California Department of Fish and Game. The New 49'ers contend that, because the state statutory amendment effectively prohibits suction dredge mining in California without completion of an environmental impact report, the Tribe's concerns about the USFS failing to conduct environmental consultation about such mining activities are moot. We disagree. "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). Although the particular suction dredge mining operations the Tribe objects to are temporarily suspended under California law pending environmental assessment, the Tribe and the USFS nonetheless have a live controversy over whether the NOI process is being conducted in violation of ESA consulting requirements. Whether or not California issues permits is an entirely distinct legal issue from whether the USFS is obliged to consult with USFWS about the activity authorized by the state permit, so a final declaration of the legal status of the NOI review process under the ESA would give the parties the primary relief they are seeking. Thus, the New 49'ers have not shown that the case is moot.

posed activities. The USFS further argues that its decision not to require a Plan leaves it with no remaining discretionary involvement with or control over the mining operations that it could exercise for the benefit of listed species.

**[4]** Our resolution of these competing positions depends on the proper characterization of what the USFS does with respect to an NOI and the activities described therein. If the Tribe's description was accurate—that the NOI is a decision to authorize the operations described in the NOI—a holding in the Tribe's favor would necessarily follow. However, we conclude that the Tribe does not accurately describe the NOI process. Rather, the NOI process was designed to be "a simple notification procedure" that would

> assist prospectors in determining whether their operations would or would not require the filing of an operating plan. Needless uncertainties and expense in time and money in filing unnecessary operating plans could be avoided thereby. . . . Th[e notice-and-comment rulemaking] record makes it clear that *a notice of intent to operate was not intended to be a regulatory instrument; it simply was meant to be a notice* given to the Forest Service by an operator which describes the operator's plan to conduct operations on [National Forest Service] lands. Further, this record demonstrates that the intended trigger for a notice of intent to operate is reasonable uncertainty on the part of the operator as to the significance of the potential effects of the proposed operations. In such a circumstance, the early alert provided by a notice of intent to operate would advance the interests of both the Forest Service and the operator by *facilitating resolution of the question*, "Is submission and approval of a plan of operations required before the operator can commence proposed operations?"

NOI Clarification, 70 Fed. Reg. at 32,728 (emphases added). Following the tenor of our precedents discussed below,

including *Western Watersheds*, 468 F.3d 1099, *Sierra Club v. Babbitt*, 65 F.3d 1502, *California Sportfishing Protection Alliance v. FERC*, 472 F.3d 593 (9th Cir. 2006), *Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996), and *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), we hold that the NOI process is not "authorization" of private activities when those activities are already authorized by other law. Rather, it is merely a precautionary agency notification procedure, which is at most a preliminary step prior to agency action being taken. The USFS acts in the sense claimed by the Tribe only in approving a Plan. The Tribe's statement that the "Ranger determines whether mining should be regulated under a[n] NOI or [Plan]," is inaccurate. Mining is not "regulated" under an NOI because an NOI is not a regulatory document. The Ranger's response to an NOI—which is not even required by statute or regulation—is analogous to the NOI itself, a notice of the agency's review decision. It is not a permit, and does not impose regulations on the private conduct as does a Plan.

In *Western Watersheds*, we explained that "the duty to consult is triggered by affirmative actions." 468 F.3d at 1102. In other words, "authorization" under the ESA and its implementing regulations means affirmative authorization of the activity, in the manner of granting a license or permit, as opposed to merely acquiescing in the private activity. Thus, in that case we held that the Bureau of Land Management's (BLM) "acquiescence" in private parties' diversions of water was not an agency action under the ESA. *Id.* at 1103, 1108.

In addition and of particular interest here, in *Western Watersheds*, the BLM asserted authority to regulate diversions of vested rights-of-way (which were protected by nineteenth-century statutes) only after deciding that a given diversion was a "substantial deviation" from the original use. The BLM's failure to regulate diversions of vested rights-of-way that fell below that threshold was merely an agency decision not to exercise discretionary involvement with or control over

the activities, and accordingly did not require ESA consulta-
tion. This was true *even if* the BLM *could* have asserted regu-
latory authority over the diversions, but simply chose, as a
matter of internal agency discretion, not to do so. *See id.* at
1108 ("[E]ven assuming the BLM could have had some type
of discretion here to regulate the diversions (beyond a 'sub-
stantial deviation'), the existence of such discretion without
more is not an 'action' triggering a consultation duty.").

Just as the BLM's internal decision not to regulate diver-
sions less than "substantial" could not be construed as "autho-
rizing" the diversions permitted under prior law, here, the
USFS's internal decision not to require a Plan for a mining
operation unlikely to cause significant disturbance of surface
resources does not "authorize" the mining already permitted
under the mining laws. *See also Cal. Sportfishing*, 472 F.3d
at 595, 598 (holding that "the agency[ ] ha[d] proposed no
affirmative act that would trigger the consultation require-
ment" for operations of a hydroelectric plant that were autho-
rized by an earlier and ongoing permit, even though the
agency was empowered to "unilaterally institute proceedings
to amend the license if it so chose"). It is merely an internal
decision not to regulate miners' exercise of their pre-existing
rights to prospect in national forests. Importantly, the USFS
is not compelled to respond to NOIs; rather the USFS need
only respond "*if* approval of a plan of operations is required
before the operations may begin." 36 C.F.R. § 228.4(a)(2)
(emphasis added). Absent the USFS's request for a Plan, min-
ers may simply proceed with their operations. In other words,
to allow mining to take place under an NOI, the USFS does
nothing. *See W. Watersheds*, 468 F.3d at 1108 (" 'inaction' is
not 'action' for section 7(a)(2) purposes").[11]

_____

[11]The USFS's use of the word "authorization" in one of its NOI
response letters does not resolve the matter. The USFS is not empowered
to make any authoritative interpretation of whether its decision constitutes
an "authorization" under the regulations implementing the ESA, *see Home
Builders*, 551 U.S. at 651-52, nor is there any suggestion that the Ranger

*Sierra Club v. Babbitt* is also instructive. In that case, we held that the BLM's issuance of an "approval" letter to a private party concerning the private party's planned construction of a right-of-way was not an agency authorization of private activity triggering the ESA consultation duty. 65 F.3d at 1511. Although the agency might have been acting in some way by issuing the letter, such was not an agency action for section 7 purposes because the private party had a contractual right to develop the right-of-way. *Id.* In other words, the private action was already authorized in the relevant sense. We explained:

> the right-of-way was granted prior to the enactment of the ESA *and* there is no further action relevant to the threatened [species] that the BLM c[ould] take prior to [the private party's] exercise of [its] contractual rights. In light of the [ESA's] plain language, the agency's regulations, and the case law construing the scope of "agency action," we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.

---

intended to do so by means of his letter to McCracken. In any event, as the Tribe recognizes in its reply brief, "the permitting agency's position regarding whether its action was an 'agency action' under the ESA is a 'legal question,' and 'not a factual question.' " (Quoting *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 11 (D.D.C. 2005)).

The Dissent also relies on the USFS's statement to the miners that "[they] may begin [their] mining operations when [they] obtain all applicable state and federal permits." Dissent at 4677. But rather than providing "authorization" or "approval" for the mining activities to begin, the USFS's statements simply pointed out the obvious: miners must obtain relevant permits before they begin mining.

In short, the record does not support the Dissent's view that the USFS's correspondence with miners affirmatively "approved" the NOIs.

*Id.* at 1509. We have reiterated this reasoning many times. *See Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1080 (9th Cir. 2001); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998); *Turtle Island*, 340 F.3d at 975.

Here, just as the contract in *Sierra Club v. Babbitt* gave the private party a right to construct the right-of-way, and the BLM was constrained from imposing conditions for the benefit of species, the relevant regulations provide USFS no authority to "approve" NOI activities related to the exercise of pre-existing mining rights unless the activities are likely to significantly disturb surface resources. Indeed, for those mining activities authorized under the mining laws and not subject to the Plan requirement, the USFS can impose no conditions whatsoever.[12]

[5] In short, we find *Western Watersheds* and *Sierra Club v. Babbitt* particularly applicable because, in both those cases as well as this one, prior law (or contract) endowed the private parties with the "right, not mere privilege," Forests Use Under Mining Laws, 39 Fed. Reg. at 31,317, to engage in the activities at issue. Where the agency is not the authority that empowers or enables the activity, because a preexisting law or contract grants the *right* to engage in the activity subject

---

[12]While the Ranger may be able to alter the way he applies the standard "likely to cause significant disturbance of surface resources" to the benefit of species (resulting in more NOIs requiring a Plan, in connection with which the Ranger *can* demand changes in the intended private conduct), his adoption and carrying out of the standard is not at issue here. *Cf.* 50 C.F.R. § 402.02 (listing as "agency action" the promulgation of regulations and the carrying out of programs "intended to conserve listed species or their habitat"). If it were, the holding in this case might be very different. Rather, the Tribe seeks to force interagency consultation for NOIs that, we must assume, are properly deemed not Plan-worthy under the governing standard. *Cf. Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 979 (7th Cir. 2005) (holding section 7 consultation not required for ministerial acceptance of NOIs filed to take advantage of a previously-authorized general permit).

*only to regulation*, the agency's decision *not* to regulate (be it based on a discretionary decision not to regulate or a legal bar to regulation) is not an agency action for ESA purposes. This case, like *Western Watersheds* and *Sierra Club v. Babbitt*, is thus distinct from *Turtle Island Restoration Network*, 340 F.3d at 976, in which permission to engage in the activity (fishing in that case) depends upon the federal agency's own discretionary authority to grant permits, which it has the power to condition for the benefit of listed species.

In a slightly modified argument, the Tribe argues that the Ranger's discretionary authority over the NOI/Plan decision enables the USFS to tell miners how to alter their activities in order to avoid significantly disturbing surface resources, and such power to direct activities could be employed for the benefit of species. *See Turtle Island*, 340 F.3d at 977 (holding that USFWS had discretion over permits because it "*could* condition permits to benefit listed species"). When the Ranger responds to an NOI by expressing concerns that the NOI is unclear or that a Plan would probably be required, however, we again do not see how the Ranger "authorizes" anything at that stage. Rather, the Ranger is merely providing advice about what additional information is needed for him to evaluate the NOI, and how the proposed miner can alter his operations to avoid filing a Plan.

*Marbled Murrelet* provides insight on this point. In *Marbled Murrelet*, we considered whether section 7 consultation was required when USFWS "consulted with [a private timber company] and provided them with information as to what they would have to do to avoid a 'take' of endangered species under the [ESA]." 83 F.3d at 1070. Environmental groups challenged this informal, voluntary consultation between the timber company and USFWS under section 7, claiming that the consultation was an agency action. We rejected the environmental groups' argument. The environmental groups' best evidence of discretionary federal agency action was a joint letter from USFWS and the California Department of Fish

and Game describing "specific conditions that must be followed to . . . avoid 'take' of the identified species under the ESA." *Id.* at 1074. We characterized this as "merely provid[ing] advice" because "there [was] no evidence that the USFWS had any power to enforce those conditions other than its authority under section 9 of the ESA, and this is not enough to trigger 'federal action' under section 7." *Id.* We explained,

> Protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 simply because it advised or consulted with a private party. Such a rule would be a disincentive for the agency to give such advice or consultation. Moreover, private parties who wanted advice on how to comply with the ESA would be loath to contact the USFWS for fear of triggering burdensome bureaucratic procedures.

*Id.*

Although *Marbled Murrelet* involved a private party's voluntary decision to consult (whereas the Ranger in this case appears to have adopted a blanket, informal policy of using the NOI process to consult with miners), its facts are analogous and its reasoning is compelling. There is nothing the USFS can do to enforce the conditions it sets forth in an NOI response, short of its authority to require a Plan. The NOI process is a "simple notification procedure" that facilitates determination of whether a Plan, and its attendant regulatory oversight, is required; it is not a regulatory action in and of itself.[13] The communications between the private party and

---

[13]We particularly note that the USFS will "notify the operator if approval of a plan of operations is required" within fifteen days of receiving an NOI. 36 C.F.R. § 228.4(a)(2). In contrast, the Ranger is entitled to spend 30 days, plus another 60 when necessary, considering the terms of

the agency at the NOI stage occur for the limited purpose of categorizing the private activity, not for the purpose of obtaining the agency's affirmative permission to act or setting forth an enforceable regulatory regime.

As we explained in *Marbled Murrelet*, environmental compliance is enhanced by encouraging private party-agency communications about the environmental impact of the intended private activities. Importantly, as described *supra*, the Organic Act and Mining Law combine to give the USFS only limited regulatory authority over mining. The USFS has interpreted its authority to materialize only when mining is likely to cause significant disturbance of surface resources. Without the NOI process, then, either the miners would be the ones making the decision about whether their activities meet the regulatory threshold, or all mining activities would require a Plan. We have already disapproved of the latter option in light of legislative intent. *See Siskiyou*, 565 F.3d at 557-58. Specifically, the USFS adopted the NOI process in response to a suggestion from the House Committee on Interior and Insular Affairs, Subcommittee on Public Lands, which recommended that the USFS use a notice procedure in order to avoid the unreasonable restrictions on small-scale mining rights, and the unnecessary burdens on federal agencies, that are associated with the costs of preparing and submitting detailed Plans for operations that do not need them. *See* Forests Use Under Mining Laws, 39 Fed. Reg. at 31,317; *see also supra* at 4660-61. On the other hand, the former option would result in too little deserved regulation. Here, giving the USFS the final say over whether an activity is likely to significantly disturb surface resources results in greater environmental pro-

---

a proposed Plan. 36 C.F.R. § 228.5(a). Preparation of a biological assessment and consultation would take considerably longer than the short time the Ranger has to review and acknowledge an NOI, strongly evidencing that the NOI process, unlike the process for submission and approval of a Plan, is merely ministerial.

tection than would result from leaving that decision up to the miners themselves, who have little incentive to voluntarily subject themselves to perhaps costly regulation. *See Marbled Murrelet*, 83 F.3d at 1074.

**[6]** In sum, the NOI process was not intended necessarily to trigger *more* environmental compliance; it was designed to make environmental compliance better and more efficient. It would undermine the goals of the entire scheme to require consultation for an NOI, the procedural device designed to avoid burdensome compliance obligations and focus the USFS's energies on those activities that are likely to cause significant disturbance. The NOI process is a careful balancing act, designed to facilitate resolution of the question of whether a Plan should be filed. Given such considerations, we conclude that the NOI process is analogous to the advice-seeking process at issue in *Marbled Murrelet* for which section 7 consultation is not required.

An almost identical regulatory scheme was at issue in *Sierra Club v. Penfold*, 857 F.2d 1307. Under 43 C.F.R. § 3809 (1986), the BLM uses a three-tiered approach to regulating placer mining on federal lands within its jurisdiction. First are "casual" use mines, for which no notice or approval is required. *Id.* at 1309. The BLM nonetheless monitors casual uses to ensure no "undue degradation" of the lands occurs. *Id.* Second are "notice" mines, for which no BLM approval is required but for which the miner must submit basic information to the BLM about the proposed operations at least fifteen days prior to commencing them. *Id.* The notice must include a statement that "reclamation of disturbed areas will be completed and that reasonable measures will be taken to prevent unnecessary or undue degradation of the lands during operations." *Id.* BLM monitors "notice" mining operations for compliance, as well. *Id.* at 1310. Third are "plan" mines, which must be approved by the BLM and subjected to environmental assessment before the operation may proceed. *Id.* at 1309.

It is clear that the BLM's approach to "casual," "notice," and "plan" mining operations follows the same structure as the USFS's approach to mining activities that "are not likely to," "might," and "are likely to" cause significant surface resource disturbance, *see* 36 C.F.R. § 228.4. This similarity was intentional. 45 Fed. Reg. 78,906 (Nov. 26, 1980) (explaining that the regulations were designed "to be as consistent as possible with the Forest USFS regulations").

In *Penfold*, we determined that the "BLM's approval of Notice mines without an [environmental assessment] does not constitute *major* federal action within the scope of NEPA." 857 F.2d at 1314 (emphasis added). *Penfold* can be read to say that the BLM's review of a notice is a "marginal" agency action, just not a "major" one. *See id.* at 1313-14. But, just as actions must be "major" to trigger NEPA obligations, actions carried out entirely by private parties must involve "affirmative" federal agency authorization to trigger section 7. The mere fact that the agency is involved in some way is not enough. Thus, even assuming the Tribe is correct that the threshold for triggering environmental compliance under the ESA is lower than for NEPA,[14] we nonetheless find our previ-

---

[14]We have previously explained that "[t]he standards for 'major federal action' under NEPA and 'agency action' under the ESA are much the same[,]" although the ESA standard is arguably more liberal because it does not contain the "major" requirement. *Marbled Murrelet*, 83 F.3d at 1075. We note, however, that agency action under the ESA is specifically defined as those actions "authorized, funded, or carried out" by a federal agency. 50 C.F.R. § 402.02. Under NEPA, agency action is defined as an activity "entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). Thus, although the ESA may be more liberal in the sense of the size of the federal undertaking that triggers the statute, NEPA may be broader in a different sense because it covers a broader array of activities than the ESA. The distinctions may thus cut both ways, further convincing us that while the NEPA and ESA analysis is certainly not interchangeable, in determining whether the federal activity is a qualifying "agency action," our analysis in *Penfold* of the BLM's equivalent of the NOI process under NEPA is highly persuasive as to the ESA question.

ous determination that a similar notice scheme was not the sort of agency action that requires environmental compliance to be additional persuasive authority in support of our holding.[15]

In sum, our conclusion is amply supported by the reasoning and holdings of our prior case law. Importantly, our conclusion is consistent with common sense as well. The operative words in the ESA and implementing regulations are "action" and "authorize," which inherently require affirmative conduct: "action" is "[t]he process of doing something; conduct or behavior," and to "authorize" is "[t]o give legal authority[,] to empower[,]. . . [t]o formally approve[, or] to sanction." Black's Law Dictionary 32, 153 (9th ed. 2009). Our conclusion is also eminently logical. Nothing in the ESA or the relevant rule-making history suggests that the ESA imposes a duty on federal agencies to *affirmatively engage* in regulatory actions to protect the environment. As the Supreme Court noted in *National Association of Home Builders*, the ESA requires agencies to "insure"—that is, " 'to make certain, to secure, to guarantee' "—that "listed species or their habitats" are not "jeopardize[d]." 551 U.S. at 666-67 (alterations omitted) (quoting *Defenders of Wildlife v. EPA*, 420 F.3d 946, 963 (9th Cir. 2005)). If agencies were forced to conform their *inaction* to the ESA's requirements, then the ESA would operate as a blanket mandate requiring federal agencies to take *affirmative* steps to *guarantee* that listed species are not harmed. That is, of course, not the law.

---

[15]We are additionally persuaded by analogy to *Penfold* that the NOI process is hardly an agency "action" (let alone an "authorization" of the mining activities) because the notice review process in *Penfold* was significantly more substantive than the review the USFS does here. If the detailed regulatory review of a notice in *Penfold* was merely a "marginal" agency action, the much less rigorous and involved review of an NOI by the USFS under 36 C.F.R. § 228.4 is not the sort of affirmative authorization we require for ESA consultation.

## CONCLUSION

**[7]** The mining laws provide miners like The New 49'ers with the "right, not the mere privilege" to prospect for gold in the Klamath River and its tributaries. We therefore find it is most accurate to say that the mining laws, not the USFS, authorize the mining activities at issue here. The USFS has adopted a simple review process to sort between those mining activities it will regulate in order to conserve forest resources, and those activities it will not regulate because such regulation would be unnecessary and unduly interfere with mining rights. The USFS's limited and internal review of an NOI for the purpose of confirming that the miner does not need to submit a Plan for approval (because the activities are unlikely to cause any significant disturbance of the forest or river) is an agency decision not to regulate legal private conduct. In other words, the USFS's decision at issue results in agency inaction, not agency action.

The decision of the district court is

**AFFIRMED**.

---

W. FLETCHER, Circuit Judge, dissenting:

I respectfully but emphatically dissent.

The issue in this case is whether the Endangered Species Act ("ESA") requires the U.S. Forest Service to consult with appropriate agencies of the federal government before approving a Notice of Intent ("NOI") to conduct suction dredge mining in the Klamath National Forest. Section 7(a)(2) of the ESA requires that a federal agency consult with one or both of the Fish and Wildlife Service and the National Marine Fisheries Service to ensure that any "agency action" is "not likely to jeopardize the continued existence" of any endan-

gered or threatened species or "to result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Consultation is required under Section 7(a)(2) whenever agency action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).

An NOI is required when suction dredge mining "might cause significant disturbance of surface resources." 36 C.F.R. § 228.4(a). Mining is not allowed unless the NOI is approved by the Forest Service. "Surface resources" include underwater fisheries habitat. *Id.* at § 228.8(e). The Klamath River system is "critical habitat" for coho salmon, a listed species.

There are two questions before us.

The first is whether Forest Service approval of NOIs to conduct suction dredge mining in the Klamath National Forest is "agency action" within the meaning of Section 7(a)(2). Under our established case law, there is "agency action" whenever an agency makes a discretionary decision about whether, or under what conditions, to allow private activity to proceed. The record in this case shows that District Rangers in the Klamath National Forest made discretionary decisions about whether, and under what conditions, to allow suction dredge mining to proceed under NOIs.

The second is whether suction dredge mining under NOIs (which, by definition, is mining that "might cause significant disturbance" to fisheries habitat) "may affect" critical habitat of the listed coho salmon. The record in this case shows such mining satisfies the "may affect" standard.

I would therefore hold that the Forest Service must consult with the Fish and Wildlife Service and the National Marine Fisheries Service[1] before allowing suction dredge mining to proceed under NOIs in the Klamath National Forest.

---

[1]The parties appear to assume that if consultation is required under Section 7(a)(2), it is required with both agencies. Without deciding the question, I will also so assume.

## I. Background

The Karuk Tribe has inhabited what is now northern California since time immemorial. The Klamath River originates in southeastern Oregon, runs through northern California, and empties into the Pacific Ocean about forty miles south of the California-Oregon border. As it runs through northern California, the Klamath River passes though the Klamath National Forest. The Klamath River system is home to several species of fish, including coho salmon. Coho salmon in the Klamath River system were listed as "threatened" under the ESA in 1997. 62 Fed. Reg. 24588 (May 6, 1997). The Klamath River system was designated a "critical habitat" for coho salmon in 1999. 64 Fed. Reg. 24049 (May 5, 1999).

The rivers and streams of the Klamath River system contain gold. Commercial gold mining in and around the rivers and streams of California was halted long ago due to the extreme harm to the environment caused by large-scale placer mining. *See generally* Charles N. Alpers et al., *Mercury Contamination from Historical Gold Mining in California*, U.S. GEOLOGICAL SURVEY FACT SHEET 2005-3014 (Oct. 2005); GREEN VERSUS GOLD: SOURCES IN CALIFORNIA'S ENVIRONMENTAL HISTORY (Carolyn Merchant ed., 1998); Scott Fields, *Tarnishing the Earth*, ENVIRONMENTAL HEALTH PERSPECTIVES 109:10 (Oct. 2001). However, small-scale recreational mining has continued. Some recreational miners "pan" for gold by hand, examining one pan of sand and gravel at a time. Others use mechanical suction dredging devices.

Suction dredge miners use gasoline-powered engines and hoses to suck rock, gravel and sand from streambeds. The material sucked from the streambed is discharged into a sluice box. As the material flows through the box, a small amount of the heavier material, including gold, is slowed by "riffles" and is then captured in the bottom of the box. The remaining material runs through the box and is deposited in a tailings pile in or beside the stream. The suction dredges at issue typi-

cally have intake hoses four or five inches in diameter. Dredging depths are usually about five feet, but can be as great as twelve feet.

The majority attempts to minimize the impact of suction dredge mining, stating it is "best described" as moving "a few cubic inches at a time" and "affect[ing] about one quarter of a cubic yard of the river." Maj. Op. at 4648, 4653. A typical suction dredge picks up from the bottom of the stream and deposits in a tailings pile about one-quarter of a cubic yard of material per day. A cubic yard contains 11,664 cubic inches. Many square yards of stream bottom are scoured in order to obtain one-quarter of a cubic yard of movable material per day, but the record does not tell us how many.

The Karuk Tribe contends that suction dredge mining adversely affects fish, including coho salmon, in the Klamath River system. The Tribe brought suit in federal district court in 2004 seeking to limit suction dredge mining in the Klamath National Forest under the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), and the ESA. The Tribe alleged that the Forest Service defendants violated these statutes when they allowed suction dredge mining under Notices of Intent ("NOIs") and Plans of Operation ("PoOs"). The district court granted judgment in 2005, but briefing on appeal was stayed by agreement of the parties until we decided a case involving suction dredge mining in the Siskyou National Forest in Oregon. *Siskiyou Regional Educ. Project v. U.S. Forest Service*, 565 F.3d 545 (9th Cir. 2009).

The Tribe prevailed in the district court in this case in its challenge to the Forest Service's approval of large-scale suction dredge mining under PoOs. By stipulation filed in the district court in April 2005, the Forest Service defendants agreed that "each of the challenged PoOs were approved without compliance with the ESA, NEPA, and their implementing regulations." That is, the Forest Service agreed that

it had to prepare appropriate documents under NEPA and to consult with the appropriate federal agencies under the ESA before approving any PoO.

However, the district court agreed with the Forest Service that compliance with NEPA and the ESA was not required for suction dredge mining allowed under approved NOIs. On appeal, the Tribe does not contend that the Forest Service must comply with NEPA before approving an NOI. But it does contend that the Forest Service must consult with appropriate federal agencies under Section 7(a)(2) of the ESA before approving an NOI. For the reasons that follow, I strongly agree with the Tribe.

## II. Regulation of Suction Dredge Mining

An approved NOI is required for any suction dredge mining that "*might cause* significant disturbance of surface resources." 36 C.F.R. § 228.4(a) (emphasis added). An approved PoO is required for suction dredge mining that "*will likely cause* significant disturbance of surface resources." *Id.* § 228.4(a)(3) (emphasis added). That is, an approved NOI is required for all suction dredge mining for which the likelihood of a "significant disturbance of surface resources" falls between "might cause" and "will likely cause."

The Department of Agriculture defines "surface resources" as including underwater "fisheries . . . habitat." *Id.* § 228.8(e). *See* 70 Fed. Reg. at 32718 ("Section 228.8 characterizes fisheries habitat as a 'National Forest surface resource[.]' . . . Fisheries habitat, of course, can consist of nothing other than water, streambeds, or other submerged lands.").

The Department recognizes that the effects of suction dredge mining vary substantially from one site to another. It wrote in a 2005 commentary:

> The environmental impacts of operating suction dredges, even small ones, are highly site-specific

depending on the circumstances and resource conditions . . . . Given this variability, the Department believes that, insofar as suction dredge operations are concerned, the need for the prior submission of a notice of intent to operate or for the prior submission and approval of a proposed plan of operations must be evaluated on a site-specific basis.

70 Fed. Reg. at 32720.

The Department has made clear, in a response to a comment directed to 36 C.F.R. § 228.4(a), that an NOI for suction dredge mining is not a "regulatory instrument," but rather "simply . . . a notice given to the Forest Service by an operator which describes the operator's plan to conduct operations on NFS lands." *Id.* at 32728; 36 C.F.R. § 228.4(a)(2) ("The District Ranger will, within 15 days of a notice of intent to operate, notify the operator if approval of a plan of operations is required before the operations may begin."). However, in that same response, the Department also made clear that requirements for NOIs vary substantially depending on the site:

[T]here can be no definitive answer to the question of what level of activity requires the submission of a notice of intent to conduct operations. As previously mentioned . . . , given the variability of the lands within the NFS subject to the United States mining laws, identical operations could have vastly different effects depending upon the conditions of the lands and other surface resources which would be affected by those mining operations. . . . *[I]n many cases the need for the submission of a notice of intent to operate must be determined based upon a case-by-case evaluation of the proposed operations and the kinds of lands and other surface resources involved.*

70 Fed. Reg. at 32728 (emphasis added).

The majority writes that the Forest Service decision to allow mining to proceed under an NOI is "most accurately described as a decision *not* to act." This is a critical point, and the majority is wrong. The Forest Service makes an actual decision whether to allow suction dredging to proceed pursuant to an NOI. As I will describe in detail below, there are seven NOIs in the record in this case. One was withdrawn. Of the remaining six, the Forest Service acted affirmatively to approve four and to deny two. There is no non-withdrawn NOI in the record that the Forest Service did not act affirmatively to approve or deny. The miners whose NOIs were approved each received a letter from the Forest Service District Ranger stating that "You *may begin* your mining operations when you obtain all applicable state and federal permits" (emphasis added). No miner was allowed to engage in suction dredge mining under an NOI unless that NOI had been explicitly approved by the Forest Service.

## III.    Notices of Intent

The term "Notice of Intent" is not specific to mining laws. It is a generic term used in a number of different statutory regimes. The discretion available to an agency in approving or denying an NOI varies depending on the statute and the implementing regulations under which the NOI is submitted. We described one such regime in *Environmental Defense Center, Inc. v. Environmental Protection Agency*, 344 F.3d 832, 853-54 (9th Cir. 2003). We explained in our opinion that the EPA regulated stormwater discharges under the Clean Water Act. Some types of discharges were governed by a "general permit" that allowed applicants to submit short NOIs certifying that they would comply with the terms of the general permit. *Id.*; *see also Texas Indep. Prod. & Royalty Owners Ass'n v. EPA*, 410 F.3d 968, 979 (7th Cir. 2005). The EPA provided applicants with a simple form NOI for that purpose.[2]

---

[2]The current general permit and form NOI are available at http://www.epa.gov/npdes/pubs/cgp2008_finalpermit.pdf. The NOI form and instructions are found at Appendix E.

*Envtl. Def. Ctr.*, 344 F.3d at 853. We wrote that "because th[is] NOI represents no more than a formal acceptance of terms elaborated elsewhere," the operator could begin discharges after submitting an NOI without waiting for a response from the EPA. *Id.*

But not all NOIs for stormwater discharges are ministerial and non-discretionary. Plaintiffs in *Environmental Defense Center* challenged a different sort of NOI from the one just described. The challenged NOI allowed discharges from small municipal storm systems. Each operator of these small systems was required to submit an NOI that included an "individualized pollution control program" addressing six criteria. Because the information required in this NOI was quite detailed, we held that this NOI was functionally identical to a permit application. *Id.* This NOI "crosse[d] the threshold from being an item of procedural correspondence to being a substantive component of a regulatory regime." *Id.* at 855.

As is evident from *Environmental Defense Center*, the mere label "Notice of Intent" does not allow us to determine how much agency discretion is involved in allowing an operator to proceed under an NOI. To make that determination, we must examine the actual practice of the agency with respect to the particular NOI at issue.

IV.   Consultation under the Endangered Species Act

Section 7(a)(2) of the ESA requires consultation prior to any "agency action" that "may affect" a listed species or its habitat:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "*agency action*") is not likely to jeopardize the continued existence of any endangered species or threat-

ened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical[.]

16 U.S.C. § 1536(a)(2) (emphasis added).

Regulations implementing Section 7 provide:

Each Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat. If such a determination is made, formal consultation is required[.]

50 C.F.R. § 402.14(a) (emphasis added).

I discuss the "agency action" and "may affect" requirements in turn.

### A.   "Agency Action"

Congress intended the term "agency action" to have a broad definition. "[T]here is little doubt that Congress intended to enact a broad definition of agency action in the ESA[.] . . . Following the Supreme Court's lead in [*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978)], we have also construed 'agency action' broadly." *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054, 1055 (9th Cir. 1994) (statutory citations omitted); *see also Western Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006) ("[T]he term 'agency action' is to be construed broadly[.]"); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998).

The regulations defining "agency action" make clear the breadth of the term:

*Action* means *all* activities or programs of any kind authorized, funded, or carried out, in whole or in

part, by Federal agencies in the United States or on the high seas. Examples include, *but are not limited to*:

> (a) actions intended to conserve listed species or their habitat;
>
> (b) the promulgation of regulations:
>
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, *permits*, or grants-in-aid; or
>
> (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (emphases added). "Section 7 and the requirements of this part apply to all actions in which there is *discretionary* Federal involvement or control." *Id.* at § 402.03 (emphasis added). The question before us is whether Forest Service approval of the NOIs at issue was an "action[ ] in which there is discretionary Federal involvement or control," such that the Forest Service's approval was "agency action" within the meaning of Section 7.

This circuit has a well-established body of law on discretion and agency action under Section 7 of the ESA. In *Turtle Island v. National Marine Fisheries Service,* 340 F.3d 969 (9th Cir. 2003), we held that Section 7 required the Fisheries Service to consult within its own agency when issuing fishing permits under the High Seas Fishing Compliance Act ("the Compliance Act"). Because the Fisheries Service had discretion whether to issue the permits, the issuance of the permits was agency action. The Service was therefore required to consult under Section 7. We wrote, "Whether the Fisheries Service *must* condition permits to benefit listed species is not the question before this court, rather, the question before us is whether the statutory language of the Compliance Act confers

sufficient discretion to the Fisheries Service so that the agency *could* condition permits to benefit listed species. We hold that the statute confers such discretion." *Id.* at 977 (emphasis in original).

In *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917 (9th Cir. 2008), we reviewed a biological opinion prepared as part of the consultation process under Section 7. We wrote, "When an agency, acting in furtherance of a broad Congressional mandate, chooses a course of action which is not specifically mandated by Congress and which is not specifically necessitated by the broad mandate, that action is, by definition, discretionary and is thus subject to Section 7 consultation." *Id.* at 929. In *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024 (9th Cir. 2005), we held that the EPA had to consult with the National Marine Fisheries Service under Section 7 before approving pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). We wrote, "EPA retains discretion to alter the registration of pesticides for reasons that include environmental concerns. Therefore, EPA's regulatory discretion is not limited by FIFRA in any way that would bar an injunction to enforce the ESA." *Id.* at 1033 (statutory citation omitted).

In *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998), we held that the Bureau of Reclamation had to consult with the National Marine Fisheries Service under Section 7 before renewing contracts with farmers for water from the federal Central Valley Project because "there was some discretion available to the Bureau during the negotiation process" leading up to the renewals. *Id.* at 1126. Finally, in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994), we held that the Forest Service was required to consult under Section 7 before allowing projects under the Land and Resource Management Plans for particular national forests.

If an agency performs an act that does not involve the exercise of discretion, that act is not "agency action" within the meaning of Section 7. For example, in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the Supreme Court held that the EPA was required only to find that nine statutory criteria specified in the Clean Water Act ("CWA") had been satisfied before transferring regulatory authority to a state. Under the CWA, the EPA had no discretion, once these criteria were satisfied, to take any action that would benefit or protect any listed species under the ESA. The Court wrote, "[T]he ESA's requirements would come into play only when an action results from the exercise of agency discretion. This interpretation [of the CWA and the ESA] harmonizes the statutes by giving effect to the ESA's no-jeopardy mandate whenever an agency has discretion to do so, but not when the agency is forbidden from considering such extrastatutory factors." *Id.* at 665.

If an agency only has discretion that is unrelated to protecting a listed species, an act by that agency is not "agency action" within the meaning of Section 7. For example, in *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995), the Bureau of Land Management ("BLM") had entered into an agreement granting a logging company the right to build new logging roads on BLM land subject to BLM approval under specified criteria. None of the criteria was relevant to the protection of protected species under the ESA. Therefore, there was no "agency action" under Section 7: "[W]e conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species." *Id.* at 1509; *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1081 (9th Cir. 2001) ("[N]owhere in the various permit documents did the FWS retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened.").

Sometimes an earlier act dictates later agency actions such that a later act involves no discretion and therefore does not require consultation. For example, in *Western Watersheds Projects v. Matejko*, 468 F.3d 1099 (9th Cir. 2006), private parties had been granted vested rights to divert water for irrigation long before the passage of the ESA. The Bureau of Land Management ("BLM") announced that it would not interfere with those previously vested rights. We held that so long as the private parties limited their activities to those consistent with their vested rights they did not have to notify the BLM of their activities, and the BLM did not have the ability to regulate their activities. Under these circumstances, we concluded that the BLM had not undertaken any discretionary "agency action" that would have required it to consult under Section 7. *Id.* at 1107-08.

An out-of-circuit example is *Texas Independent Producers and Royalty Owners Ass'n v. EPA*, 410 F.3d 964 (7th Cir. 2005), in which the EPA consulted under the ESA before exercising its discretion to grant a "general permit" authorizing private operators to discharge stormwater under the Clean Water Act. *Id.* at 979. The operators then filed individual NOIs to discharge in accordance with the conditions of the general permit. *Id.* at 968. The Seventh Circuit held that the EPA did not have to consult on the individual NOIs because it had already consulted under the ESA before granting the general permit. The terms of the general permit dictated the manner in which stormwater would be discharged, thereby eliminating any discretion by the EPA in approving or denying an individual NOI.

## B. "May Affect"

An agency is required to consult when its action "may affect" listed species or designated critical habitat. 50 C.F.R. § 402.14(a). An agency can avoid the obligation to consult only if it determines that its action will have "no effect" on listed species or designated critical habitat. *Thomas*, 30 F.3d

at 1054 n.8. Once an agency has determined that its action "may affect" listed species or critical habitat, the agency may proceed with formal consultation or may choose instead to consult informally with the appropriate agency. If the consulting agency determines during informal consultation that the proposed action is "not likely to adversely affect any listed species or critical habitat," formal consultation is not required and the process ends. 50 C.F.R. § 402.14(b)(1). Thus, actions that have any chance of affecting listed species or critical habitat — even if it is later determined that the actions are "not likely" to do so — require an agency at least to consult informally.

We have previously explained that "may affect" is a "relatively low . . . threshold" for triggering consultation. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). " '*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation[.]' " *Id.* at 1019 (quoting 51 Fed. Reg. 19926, 19949 (June 3, 1986)) (emphasis in *Lockyer*). The Secretaries of Interior and Commerce have explained that "the threshold for formal consultation must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' " that their actions do not jeopardize listed species or critical habitat under section 7(a)(2). 51 Fed. Reg. at 19949.

In response to concerns that the "may affect" standard is too burdensome, the Secretaries explained that the availability of informal consultations mitigates any burden on the affected agencies. *Id.* at 19950. The Secretaries therefore rejected the suggestion that the consultation requirement should be triggered on a higher showing than the low "may affect" threshold. *Id.* at 19949.

## V.   Discussion

### A.   Challenged Notices of Intent

Four NOIs are challenged in this appeal. All four are for suction dredge mining in the Happy Camp District of the

Klamath National Forest. As noted above, an approved NOI is required for all suction dredge mining for which the likelihood of a "significant disturbance of surface resources" falls between "might cause" and "will likely cause." 36 C.F.R. § 228.4(a). "Surface resources" includes "fisheries habitat." *Id.* § 228.8(e). The Klamath River system is critical habitat for the listed coho salmon.

Before the 2004 dredging season, the Forest Service had issued a two-page generic handout requiring information from operators who sought to engage in suction dredge mining pursuant to an NOI:

> Describe what you plan to do. Include when and how you will be operating, the proposed start-up date, and the expected duration of the activities. List other details such as the number of people involved in the operation, equipment you intend to use (sizes, capacity, frequency of use), depth of proposed suction dredging or excavation, how waste material will be handled, what vegetation will be removed, the size of area to be disturbed, quantity of material to be removed, housing or camping facilities to be used, and the method for sewage and waste disposal.

In preparation for the 2004 season, Happy Camp District Ranger Alan Vandiver decided that he needed more information than required by the handout. He was particularly concerned with the effect of suction dredge mining on the critical habitat of listed coho salmon. Vandiver consulted with biologists Bill Bemis and Jon Grunbaum, who are employees of the Forest Service, not the Fish and Wildlife Service or the National Marine Fisheries Service.

Vandiver wrote the following memorandum on May 24, 2004:

> On April 20th a meeting was held in Orleans to discuss possible fisheries issues relating to dredging.

A number of opinions were shared on the possible effects. . . .

Following the Orleans meeting I asked our District Fisheries biologists, Bill Bemis and Jon Grunbaum, to develop recommendations, for my consideration, for the upcoming dredging season. They were not able to come to agreement on a list of fisheries recommendations. Their opinions varied widely on the effect of dredge operations on fisheries. I identified three key fisheries issues specific to the Happy Camp District[:] cold water refugia areas in the Klamath River, the intensity of dredge activities and the stability of spawning gravels in some portions of Elk Creek. These issues I used to help develop a threshold for determining a significant level of surface disturbance. I felt it was important from a cumulative effects standpoint to determine a threshold of dredge density on the streams, as well as identify the critical cold water refugia areas. . . .

. . . I discussed at length with Bill [Bemis] and Jon [Grunbaum] the effect on fisheries if the dredge activity was concentrated or dispersed over the length of the river. Concentrated use would result in longer river stretches without dredge activity and therefore less possible impacts to fisheries in the longer stretches. Distributed use would result in dispersed possible effects over the entire length of the river. . . . Considering the limited dredge operations in cold water refugia areas and the limited dredge access, I developed a threshold of 10 dredges per mile on the Klamath River and 3 dredges per mile on the Klamath tributaries. My thinking was the larger Klamath River, excluding the cold water refugia, could accommodate more dredge density with less impact than the smaller tributaries. . . .

On May 17, 2004 I met with members of the New 49'ers, the Karuk Tribe and our District fisheries biologists to discuss the upcoming dredge season. We discussed the key issues with respect to fisheries including cold water refugia areas in the Klamath River, the intensity of dredge activities and the stability of spawning gravels in the portion of Elk Creek from the East Fork of Elk Creek to Cougar Creek. See notes for May 17th for more detail.

The first of the NOIs challenged in this appeal was submitted by a recreational mining group called the "New 49'ers." The New 49'ers own numerous mining claims in the Happy Camp District. On May 17, 2004, District Ranger Vandiver met with two representatives of the New 49'ers. Based on his earlier consultation with Bemis and Grunbaum, Vandiver instructed the New 49'ers on "three primary issues."

First, Vandiver instructed the New 49'ers that cold water refugias must be maintained within 500 feet of the mouths of twenty-two named creeks that fed into the Klamath River. Second, he instructed them that tailings piles must be raked back into the "dredge holes in critical spawning areas" of Elk Creek "in a timely manner as operations proceed, but no later than the end of the season." Third, he instructed them that there could be no more than ten dredges per mile on the Klamath River, and no more than three dredges per miles on Klamath tributaries.

On May 24, 2004, a week after their meeting with Vandiver, the New 49'ers submitted a detailed eight-page single-spaced NOI for suction dredge mining in the Happy Camp District during the 2004 season. The NOI proposed mining on approximately 35 miles of the Klamath River and its tributaries. The NOI estimated that each dredge would move an average of one quarter of a cubic yard of material per day. In accordance with Vandiver's instructions, the NOI specified that no dredging would occur in specified cold water refugia

in the summer and early fall, that dredging holes would be filled in coho salmon spawning grounds on Elk Creek, and that dredge density would not exceed ten dredges per mile on the Klamath River and three dredges per mile on its tributaries.

On May 25, Vandiver sent the New 49'ers a letter approving their NOI. On May 26, Bemis sent a "Note to the File" stating:

> The Notice of Intent (NOI) for the new 49'ers this year has an intensity of approximately 40 dredges over the 35 miles of the Klamath covered by their claims. They have agreed to a density of no more than 10 dredges in any one-mile at anytime. The new 49'ers have agreed to avoid the area around tributaries to the Klamath Rivers. The club has agreed to pull back dredging tailings in a critical reach within Elk Creek. These agreements and others explained in the NOI should reduce the impacts to anadromous fisheries on the Happy Camp Ranger District.

The second NOI was submitted by Nida Johnson, an individual miner who planned to mine thirteen claims. She submitted the NOI on May 29, 2004, noting that it was the "result of a meeting at the Happy Camp U.S.F.S. May 25, 2004." She explained that she was processing ore with dredges with four and five inch intake pipes. She wrote that "[d]redge tailings piles in Independence Cr[eek] will be leveled." In an attachment, she wrote:

> As recommended by the Forest Service, no dredging will be conducted on the Klamath River within 500 feet above and below the mouth of Independence Creek between June 15th and October 15th. I totally disagree with these distances and believe that dredging is actually beneficial to fish survival, but I am

willing to follow these recommendations in order to
continue with my mining operations.

Vandiver approved the NOI on June 14.

The third NOI was submitted by Robert Hamilton, an indi-
vidual miner who planned to mine on four claims. He submit-
ted his NOI on May 11, 2004. He stated that he planned to use
a four-inch suction dredge for about two weeks during July.
Under the heading "precautions," he wrote that he would limit
dredge density to three per mile, and that "[t]ailings will be
returned to dredge hole if possible in shallow areas or spread
over large area in deep areas." Vandiver approved the NOI on
June 15.

The fourth NOI was submitted by Ralph Easley, an individ-
ual miner who planned to mine on a single claim. He submit-
ted his NOI on June 14. He stated that he planned to use a
four inch suction dredge from the beginning of July to the end
of September. He stated that the "[d]redge tailings will be
raked back into dredge holes." Vandiver approved the NOI on
June 15.

In addition to the four NOIs specifically at issue in this
appeal, the record contains information about NOIs for suc-
tion dredging in two other districts of the Klamath National
Forest—the Orleans and the Scott River Districts. Examina-
tion of these two NOIs provides important information about
the Forest Service's practices with respect to section dredge
mining pursuant to NOIs.

First, on April 26, 2004, the New 49'ers submitted a
detailed eight-page single-spaced NOI for suction dredge
mining in the Orleans District. On May 13, Acting Forest
Supervisor William Metz refused to approve the NOI. Metz
wrote:

There is an important cold water refugia at the
mouth of Wooley Creek that was discussed on the

April 23, 2004 field trip as needing protection. This was not mentioned in your NOI. Protection of this refugia is critical to the survival of migrating anadromous fish.

Metz wrote further:

Due to the anadromous fisheries in the lower Salmon River the stability of spawning gravels for fish redds [spawning nests] is a major concern. Redds can be lost if loose tailings piles erode away by stream course action while eggs are still present. Your NOI and the California Fish and Game Suction Dredge regulations fall short of addressing mitigations for this issue.

On May 24, the New 49'ers submitted a revised NOI for mining in the Orleans District. Dave McCracken, General Manager of the New 49'ers, wrote in a cover letter to the NOI, "If this Notice does not adequately address your concerns than [sic] I would suggest that we arrange an on-the-ground meeting at the earliest possible time." Then, anticipating that Metz would still not approve the NOI, the New 49'ers withdrew the revised NOI on May 29. McCracken wrote to Metz:

From the substantial amount of dialog we have had with your office, other District offices, the Supervisor's office, Karuk Tribal leaders, active members of the Salmon River Restoration Council and others within local communities over the past several months, it has become increasingly clear that there are too many sensitive issues for us to try and manage a group mining activity along the Salmon River at this time.

Second, on April 28, 2004, the New 49'ers submitted a detailed seven-page single-spaced NOI for suction dredge

mining in the Scott River District. The NOI proposed an esti-mated fifteen dredges along fifteen miles of "stream course," with "[d]ensities of above five dredges per 100 yards . . . not anticipated." The NOI for the Scott River District made a gen-eral commitment concerning mining in cold water refugias at the mouths of tributaries. After giving an example of a refugia, the NOI stated, "The 49'ers are committed to work-ing with the Forest Service and [Department of Fish and Game] to identify these areas . . . and to adjust their operation to prevent disturbance and stress to these fish during critical time periods." Unlike the NOIs for mining in the Happy Camp and Orleans Districts, the NOI for the Scott River Dis-trict made no provision for raking tailings piles back into dredge holes. On May 10, District Ranger Ray Haupt refused to approve the NOI, but for reasons unrelated to protection of fisheries. Haupt wrote,

> I am unable to allow your proposed mining opera-tions for the SRRD [Scott River Ranger District] under a NOI because of your bonded campsite which allows your club members to camp (occupancy) lon-ger than the 14 day camping limit. Your current Plan of Operations allows for extended camping (longer than 14 days) for your members, while they are actively engaged in mining. I am approving your mining operations for 2004 under a Plan of Opera-tions with the following conditions . . . .

None of the conditions in the Plan of Operations related to specific cold water refugia or tailings piles.

In total, there are seven NOIs in the record. Four of them are for suction dredge mining in the Happy Camp District. All four of these NOIs were approved by the Forest Service because they complied with the criteria formulated by District Ranger Vandiver for the protection of the critical habitat of the listed coho salmon. A fifth NOI was submitted for suction dredge mining in the Orleans District. That NOI was denied

by the Forest Service because it did not comply with criteria for the protection of critical fisheries habitat. A revised NOI was then submitted, but it was withdrawn in anticipation of its being denied. Finally, a seventh NOI was submitted for suction dredge mining in the Scott River District. That NOI was denied by the Forest Service for reasons unrelated to fisheries habitat.

The Forest Service took affirmative action on all of the six NOIs that were not withdrawn. The Forest Service approved four of them and denied two of them. In no case did the Forest Service take "no action," as the majority opinion erroneously contends.

### B.   Consultation under Section 7(a)(2)

As noted above, two criteria must be met before consultation is required under Section 7(a)(2) of the ESA. Those criteria are: (1) there must be a proposed "agency action," and (2) the proposed agency action "may affect" a listed species or its habitat. I conclude that each of these criteria have been satisfied.

### 1.   Agency Action

The Forest Service takes "agency action" under Section 7(a)(2) of the ESA in deciding whether to approve or deny NOIs for suction dredge mining if it exercises discretion in making that decision. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.03 (Section 7 "appl[ies] to all actions in which there is discretionary Federal involvement or control").

I conclude that the Forest Service exercised discretion in three ways in approving or denying NOIs for suction dredge mining in the Klamath National Forest. Because the Forest Service exercised discretion in approving or denying these NOIs, it took "agency action" within the meaning of Section 7(a)(2).

First, the Forest Service exercised discretion in formulating criteria for the protection of critical habitat of listed coho salmon. Those criteria governed the approval or denial of NOIs for suction dredge mining. As described in detail above, District Ranger Vandiver of the Happy Camp District prepared for the 2004 mining season by meeting with Forest Service biologists Bemis and Grunbaum. After consulting with them, Vandiver formulated criteria for protecting critical habitat from the effects of suction dredge mining conducted pursuant to NOIs. He specified by name each of the tributaries to the Klamath River that provided cold-water refugias that should be protected; he specified the maximum number of dredges per mile on the river and on its tributaries; and he required that tailings be raked back into dredge holes.

Once Vandiver had exercised his discretion to formulate these specific criteria, they became conditions with which any would-be miner submitting an NOI in the Happy Camp District had to comply. For example, Nida Johnson's NOI indicated that she would respect a cold-water refugia by refraining from dredging within 500 feet of the mouth of Independence Creek. But she made clear that she was doing so only because of the condition imposed by Vandiver, and that, absent compliance with that condition, she would not be allowed to engage in mining:

> I totally disagree with these distances and believe that dredging is actually beneficial to fish survival, but I am willing to follow these recommendations in order to continue with my mining operations.

Similarly, a week after Vandiver had communicated the criteria to the New 49'ers, that group submitted an eight-page single-spaced NOI for suction dredge mining in the Happy Camp District that complied with the criteria. Vandiver approved the NOI the next day.

In one sense, Vandiver is to be commended. He recognized the danger that suction dredge mining posed to the critical

habitat of coho salmon, and he consulted with Forest Service biologists Bemis and Grunbaum in formulating protective criteria for approving mining under NOIs. The problem is that Vandiver failed to consult with employees of the required agencies. The ESA requires Vandiver consult with the Fish and Wildlife Service and the National Marine Fisheries Service, not merely within his own agency. Therefore, Vandiver's consultation with Forest Service biologists Bemis and Grunbaum did nothing to comply with Section 7.

Second, the Forest Service exercised discretion in refusing to approve a detailed NOI submitted by the New 49'ers for suction dredge mining in the Orleans District. Acting Forest Supervisor Metz refused to approve the NOI because, in his view, it provided insufficient protection of fisheries habitat: first, a cold-water refugia at the mouth of a particular creek was not mentioned in the NOI; second, there was insufficient mitigation of the dangers posed by loose tailings piles left by the dredges. The New 49'ers submitted a new NOI, but then withdrew it five days later. The New 49'ers' representative wrote that despite a "substantial . . . dialog," the Forest Service's protective conditions meant that "there are too many sensitive issues for us to try and manage a group mining activity along the Salmon River at this time."

Third, the Forest Service exercised discretion when its employees applied different criteria for the protection of fisheries habitat in different districts of the Klamath National Forest. District Ranger Vandiver developed and applied very specific protective criteria for granting or denying NOIs in the Happy Camp District. Different protective criteria for NOIs were developed and applied in the Scott River District. There is nothing in the record to tell us how the criteria were developed in the Scott River District. But it is clear from the record that those criteria were different, at least in their application, from those in the Happy Camp District. The New 49'ers submitted an NOI to District Ranger Haupt in the Scott River District that complied in full with one of the criteria applied

in the Happy Camp District by specifying the maximum number of dredges per mile. The NOI complied, to some degree, with a second Happy Camp criterion by committing to "work-[ing] with" the Forest Service to identify cold-water refugia. But the NOI did not promise to observe any particular cold-water refugia and did not promise to stay a specified distance from any creek mouth. Finally, the NOI did not comply at all with the third Happy Camp criterion, for it did not mention raking tailings piles back into dredge holes. Scott River District Ranger Haupt denied the NOI for reasons unrelated to these three criteria, and he did not include these criteria in the Plan of Operations.

A discretionary decision is one that is not dictated or controlled by precise rules or regulations. District Rangers Vandiver and Haupt each formulated and applied their own, differing criteria in deciding whether to grant or deny NOIs for suction dredge mining in their districts. In neither district were those criteria dictated or controlled by precise rules or regulations. *See* 70 Fed. Reg. at 32720, 32724 (explaining that NOIs must be evaluated on a site-specific basis, and that there is no "universal definition" of "significant disturbance"). This difference in formulating and applying criteria is the very definition of the exercise of discretion.

In every instance in the record before us, except one in which the NOI was withdrawn, the Forest Service affirmatively acted. In each of those instances, it either approved or denied the NOI in which suction dredge mining was proposed. In each instance, the Forest Service took some kind of discretionary action. Those actions were "agency actions" within the meaning of Section 7 of the ESA.

### 2.   "May Affect" Listed Species or Habitat

Section 7 and an implementing regulation require consultation whenever an agency action "may affect . . . critical habitat" of a listed species. 50 C.F.R. § 402.14(a). An NOI is

required whenever proposed suction dredge mining "might cause significant disturbance of surface resources." 36 C.F.R. § 228.4(a). "Surface resources" include fisheries habitat. *Id.* at § 228.8(e). The Klamath River system is a "critical habitat" for listed coho salmon.

Whether suction dredge mining under NOIs "may affect" "critical habitat" can almost be resolved as a textual matter, without the necessity to consult the factual record. That is, by definition, suction dredge mining under an NOI "might cause significant disturbance" of fisheries habitat in the Klamath River system. If the phrase "might cause significant disturbance" of "fisheries habitat" is given an ordinary meaning, it follows almost automatically that suction dredge mining pursuant to an NOI "may affect" critical habitat of the coho salmon. Indeed, the Forest Service does not dispute that suction dredge mining in the Klamath River system pursuant to NOIs "may affect" the listed coho salmon and its critical habitat.

However, the New 49'ers contend that the record "is devoid of any evidence whatsoever that the four challenged suction dredge mining activities 'may affect' the coho salmon 'species' listed in Northern California." The New 49'ers make two arguments in support of their contention. Neither argument withstands scrutiny.

First, the New 49'ers argue that there is no evidence "that even a single member of any listed species would be 'taken' by reason" of the suction dredge mining at issue. "Take" has a particular definition under the ESA. 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."); *Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.*, 515 U.S. 687, 691 (1995). Even if it is true (which I will assume *arguendo*) that suction dredge mining does not effectuate a "taking" of coho salmon under the ESA, this has no bearing on whether such mining "may

affect" the salmon or its critical habitat under 50 C.F.R. § 402.14(a).

Second, the New 49'ers argue that Vandiver's consultation process within the Forest Service, and its resulting guidelines, "assured" that there would be "no impact whatsoever on listed species." This argument cuts against rather than in favor of the New 49'ers. The fact that District Ranger Vandiver formulated his own criteria to mitigate effects of suction dredging on the coho salmon and their critical habitat does not mean that the "may affect" standard was not met. Indeed, the fact that Vandiver consulted with Forest Service biologists in an attempt to reduce any adverse impact on coho salmon and their habitat suggests exactly the opposite.

A review of the record reveals abundant evidence that suction dredging under NOIs in the Happy Camp District "may affect" coho salmon and their critical habitat. Coho salmon in the Klamath River system were listed as "threatened" in 1997, and the river was listed as "critical habitat" two years later. 62 Fed. Reg. 24588, 24588 (May 6, 1997); 64 Fed. Reg. 24049 (May 5, 1999). In listing the salmon, the National Marine Fisheries Service noted that its population was "very depressed." 62 Fed. Reg. at 24588. The Fisheries Service concluded that "human-induced impacts," including overharvesting, hatchery practices, and habitat modification including mining had played a significant role in the decline, and had "reduced the coho salmon populations' resiliency" in the face of natural challenges. *Id.* at 24591-92. The Fisheries Service also concluded that "existing regulatory mechanisms are either inadequate or not implemented well enough to conserve" the salmon. *Id.* at 24588.

The record also includes information that Forest Service biologist Grunbaum provided on the effects of suction dredge mining at a meeting of Forest Service personnel on April 20, 2004. Grunbaum wrote that relatively few studies of suction dredging had been performed, but "the majority . . . showed

that suction dredging can adversely affect aquatic habitats and biota." The effects varied across ecosystems; in some, "dredging may harm the population viability of threatened species." Grunbaum summarized specific potential adverse effects. First, "[e]ntrainment by suction dredge can directly kill and indirectly increase mortality of fish — particularly un-eyed salmonid eggs and early developmental stages." Second, disturbance from suction dredging can kill the small invertebrates that larger fish feed on, or alter the invertebrates' environment so that they become scarce. Third, destabilized streambeds can "induc[e] fish to spawn on unstable material," and fish eggs and larvae can be "smothered or buried." Fourth, because the streams the salmon occupy are already at "near lethal temperatures," even "minor" disturbances in the summer can harm the salmon. Fifth, juvenile salmon could be "displaced to a less optimal location where overall fitness and survival odds are also less." Finally, a long list of other factors — disturbance, turbidity, pollution, decrease in food base, and loss of cover associated with suction dredging — could combine to harm the salmon.

I therefore conclude that the suction dredge mining challenged in this case "may affect" the listed coho salmon and its critical habitat.

### C.   Burden on the Forest Service

The burden imposed upon the Forest Service by the obligation to consult under Section 7 of the ESA is not great. Indeed, District Ranger Vandiver has already consulted with Forest Service biologists Bemis and Grunbaum in formulating the detailed criteria for suction dredge mining NOIs in the Happy Camp District of the Klamath National Forest. That consultation could not satisfy Section 7 because Bemis and Grunbaum work for the Forest Service rather than the Fish and Wildlife Service or the National Marine Fisheries Service. But if Vandiver had consulted with employees of those agencies, that consultation could have satisfied Section 7. If,

after engaging in that consultation, Vandiver had formulated sufficiently detailed coho-protective criteria based on the views of the Fish and Wildlife Service and the National Marine Fisheries Service, any NOIs approved using those criteria would not have required the exercise of further discretion and therefore would not have required further consultation. *See Texas Indep. Producers*, 410 F.3d at 979; *Envtl. Def. Ctr.*, 344 F.3d at 853. Of course, Vandiver formulated his criteria for NOIs only for the Happy Camp District. But there is no reason why the Forest Service could not consult with the Fish and Wildlife Service and the National Marine Fisheries Service to formulate comparable criteria for all of the districts in the Klamath National Forest, with the result that any individual NOI approved under those criteria would not require further consultation.

## Conclusion

By definition, suction dredge mining pursuant to an NOI is mining that "might cause" "significant disturbance of surface resources," including the surface resource of "fisheries habitat." The Forest Service does not dispute that such mining "may affect" critical habitat of coho salmon in the Klamath River system within the meaning of Section 7 of the ESA. The Forest Service therefore has an obligation under Section 7 to consult with the relevant agencies at some point in the process of allowing such mining.

The Forest Service had several available choices. It could have consulted under Section 7 when it promulgated the regulation for dredge mining under NOIs. That is, it could have consulted when it set the threshold criterion for an NOI as mining that "might cause significant disturbance of surface resources" including fisheries habitat. Or it could have consulted under Section 7 when it formulated habitat-protective criteria for approving NOIs. That is, it could have consulted when District Ranger Vandiver formulated his criteria for approving the NOIs for the Happy Camp District. Or, finally,

in the absence of criteria such as those formulated for the Happy Camp District, it could have consulted under Section 7 with respect to each individual NOI.

The one choice that was not available to the Forest Service was *never* to consult. Yet that is the choice the Forest Service made. In making that choice, the Forest Service violated Section 7 of the ESA.

I respectfully but emphatically dissent from the conclusion of the majority to the contrary.